K N ENERGY, INC., APPELLANT, V. CITY OF SCOTTSBLUFF, A MUNICIPAL CORPORATION, ET AL., APPELLEES.

447 N.W.2d 227

Filed October 27, 1989.    No. 88-937.

M.J. Bruckner, W. Scott Davis, and Anne E. Winner, of Bruckner, O'Gara, Keating, Sievers & Hendry, P.C.; and B.J. Becker and A.R. Madigan for appellant.

Clark G. Nichols and Philip M. Kelly, of Winner, Nichols, Douglas, Kelly and Arfmann, P.C.; Bevin B. Bump, of Bump and Bump; James D. Larson, of Wurst, Pearson, Larson, Underwood & Mertz; James L. Haszard, of McHenry & Watson; and George P. Burke, of Van Steenberg, Myers, Burke & Wilson, for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

BOSLAUGH, J.

This action was commenced by the plaintiff, K N Energy, Inc. (K N), against the City of Scottsbluff to enjoin the defendant city from enforcing ordinance No. 3071, which established rates to be charged by the plaintiff for natural gas service furnished to customers in the City of Scottsbluff, Nebraska, beginning 30 days after February 22, 1988. Similar actions were commenced against the municipalities of Minatare, Bridgeport, Mitchell, Terrytown, Lyman, Gering, Morrill, Bayard, Lodgepole, Kimball, Potter, Chappell, Sidney, Broadwater, Alliance, Lewellen, Oshkosh, Rushville, Hemingford, Hay Springs, Gordon, Crawford, and Chadron, all of which had adopted ordinances similar to ordinance No. 3071 of the City of Scottsbluff.

Since all 24 cases involved similar questions of fact and law, they were consolidated for trial in the district court. For the same reason, all 24 cases have been consolidated for briefing and argument in this court.

The plaintiff is engaged in the gathering, transmission, distribution, and sale of natural gas and provides natural gas service to customers in each of the defendant municipalities. On

September 1, 1987, pursuant to Neb. Rev. Stat. § 19-4608 (Reissue 1987), the plaintiff filed notices of its intent to change the rates for gas service in 31 municipalities in western Nebraska.

Section 19-4608 is a part of the Municipal Natural Gas Regulation Act, Neb. Rev. Stat. §§ 19-4601 to 19-4623 (Reissue 1987), enacted by the Legislature in 1987. The act prescribes the procedure for filing and establishing or modifying rates for natural gas service to customers within municipalities. None of the parties have raised any issue concerning the validity of the act.

In addition to filing for a rate increase, the plaintiff submitted a "Notice of Proposed Rate Area Boundaries" in accordance with § 19-4606 of the act. Since no objections were made to the proposed rate area boundaries, they became effective as provided in the act. The significance of rate area boundaries is that the act contemplates that rates shall be uniform throughout each rate area.

Since the municipalities failed to take final action within 90 countable days, as provided in § 19-4607(1), the rates proposed by the plaintiff became effective, subject to refund, on December 1, 1987.

As contemplated by the act, the plaintiff supplied detailed information in support of its proposed increase in rates. See § 19-4611.

The 24 municipalities which are defendants in these actions employed Dahlen, Berg & Co., which reviewed the plaintiff's proposed increase in rates and submitted a report to the defendants which proposed rates lower than those requested by the plaintiff. The plaintiff then filed its "rebuttal," as provided in § 19-4616(3).

Thereafter, area rate hearings were held before a hearing officer selected by the defendants, all as provided in § 19-4616(4). The defendants then adopted findings of fact and conclusions of law and rate ordinances, as provided in § 19-4616(6).

Section 19-4616(7) provides:

Within thirty days of the date of final action by the municipalities within a rate area, a utility may initiate

proceedings for judicial review of the decision of any municipality in the rate area to the district court. At the time the utility initiates action for judicial review, it shall join in such action as parties all municipalities in the rate area whose actions are being challenged.

Section 19-4602(8) provides: "Judicial review shall mean, but shall not be limited to, injunctive relief and other equitable relief."

The plaintiff then commenced actions against each of the defendants to enjoin enforcement of the rate ordinances.

Section 19-4612 of the act provides in part:

(1) The municipality, in the exercise of its power under the Municipal Natural Gas Regulation Act to determine just and reasonable rates for public utilities, shall give due consideration to the public need for adequate, efficient, and reasonable natural gas service and to the need of the utility for revenue sufficient to enable it to meet the cost of furnishing the service, including adequate provisions for depreciation of its utility property used and useful in rendering service to the public, and to earn a fair and reasonable return upon the investment in such property.

(2) Cost of service shall include operating expenses and a fair and reasonable return on rate base, less appropriate credits.

(3) In determining a fair and reasonable return on the rate base of a utility, a rate of return percentage shall be employed that is representative of the utility's weighted average cost of capital including, but not limited to, long-term debt, preferred stock, and common equity capital.

The plaintiff alleged that the rates in force at the time of its filing for a rate increase

did not and would not provide K N with revenue sufficient to enable it to meet the cost of furnishing such service, including adequate provision for depreciation on its utility property used and useful in rendering service to customers within the rate area (hereinafter "property"), and to earn a fair and reasonable return upon its investment in such property.

The plaintiff further alleged:

> The adjustments to K N's rate filing in Exhibit 17 are improper, unreasonable and arbitrary. The rates purportedly adopted by the City do not provide K N with a fair and reasonable return upon the reasonable value of the property being used to provide natural gas service to the rate area, are not consistent with findings and conclusions in Exhibit 17 and under the facts alleged in this petition, the rate [sic] purportedly established by Ordinance No. 3071 are not just, not reasonable, inadequate and confiscatory.
>
> . . . By their failure and refusal to establish the new rates requested by K N's Application, the Defendants are acting in a confiscatory and arbitrary manner and are depriving K N of its property without due process of law and are in violation of the Fourteenth Amendment of the Constitution of the United States and in violation of Article I, Section 3 of the Constitution of the State of Nebraska and the statutes of the State of Nebraska, including Section 19-4601, et seq., R.R.S. (Supp. 1987).

In each case, the plaintiff prayed that the court find the rates established by the defendant were not just, not reasonable, inadequate, arbitrary, and confiscatory and did not provide K N with a fair and reasonable return on its property used and useful to provide service to the natural gas consumers in the defendant city; that the court find that any lesser rates than the new rates set out in exhibit 12 were not just, not reasonable, inadequate, arbitrary, and confiscatory; and that the defendant be enjoined and prohibited by proper order of the court from preventing K N from continuing the rates set out in exhibit 12 in force and effect and from collecting the same for natural gas consumption billings until such time as the defendant by proper action passed an ordinance putting the rates set out in exhibit 12 into effect or until such time as the defendant by proper exercise of its regulatory powers established just, reasonable, adequate, and compensatory rates to be charged for gas sold to K N's customers in the defendant city.

The defendants' answers prayed that the plaintiff's petitions be dismissed.

Trial in the district court commenced on July 19, 1988, and was concluded on July 28. The evidence consisted of the rate ordinances, the plaintiff's rate filings with supporting documents, the reports submitted by the defendants, the plaintiff's rebuttals, the records made at the rate area hearings, and the testimony of expert witnesses offered by the parties.

On September 15, 1988, the trial court found that the plaintiff had failed to sustain its burden of proving that the rates established by the defendants were unjust, unreasonable, and confiscatory and dismissed each of the plaintiff's petitions. From those judgments the plaintiff has appealed.

The trial court's judgments made detailed findings on the controverted issues, including the issue of the scope of its review in these actions. The trial court found: "The scope of this Court's review is de novo on the record made at the various rate hearings."

The plaintiff's first assignment of error is that the trial court erred in holding that the scope of its review was de novo on the record made at the various rate hearings.

There are several problems with the trial court's finding as to its scope of review in these actions.

The rate hearings contemplated by the act are not hearings of a quasi-judicial nature, but are for the purpose of assembling and recording information to be used as a basis for later legislative action by the municipalities, which determine the rates to be charged within their jurisdictions.

A municipal corporation in fixing rates to be charged by a public utility acts in a legislative rather than a judicial capacity. *Kansas-Nebraska Nat. Gas Co., Inc. v. City of Sidney*, 186 Neb. 168, 181 N.W.2d 682 (1970). As a consequence, the "findings of fact and conclusions of law" referred to in § 19-4616(6) and adopted by each municipality at the time the rate ordinance is adopted are really legislative findings which are not subject to judicial review.

There can be no appeal from legislative action. In *Williams v. County of Buffalo*, 181 Neb. 233, 147 N.W.2d 776 (1967), we held that a statute which attempted to provide for an appeal from the action of a city council in an annexation matter was invalid as an attempt to delegate legislative powers to the

judiciary. In that case we noted: "The passage of the ordinance presumes a finding that the conditions and limitations contained in the delegating statute exist or have been complied with. The findings of the city council thereon are legislative and are in a sense merged in the ordinance upon its passage." *Id.* at 236, 147 N.W.2d at 780.

After describing the provisions of the act which provided for an "appeal from the annexation ordinance to the district court," we said:

> A reading of this section shows that its intent was to lodge jurisdiction in the district court by appeal to review the propriety of the legislative action taken by the city. It prescribed the hearing on appeal to be as one in equity de novo, a plain indication that the court was to assume the position of a superior legislative body in hearing the appeal. This is clearly an attempt by the Legislature to impose a legislative function upon the judiciary and is violative of Article II, section 1, of the Constitution. The proper method of questioning the validity of such legislative action is by collateral attack, that is, by injunction, quo warranto, or other suitable equitable action.
>
> . . . .
> We think the correct rule is stated in Wagner v. City of Omaha, *supra*, which holds that where the annexation of lands to a city is by legislative action, constitutional and statutory limitations on the nature and extent of the territory to be annexed must be observed, and where such annexation is illegal injunction is a proper remedy. It is our considered opinion that a collateral attack is not only a proper remedy but the exclusive remedy. We do not mean to infer, however, that an appeal will not lie from judicial or quasi-judicial findings of a public officer or administrative board as to whether or not he or it has complied with standards and guidelines imposed for the administration of a legislative act.
>
> In the instant case, the Legislature delegated the power to the city to include by ordinance any contiguous or adjacent lands, lots, tracts, streets, or highways as are

urban or suburban in character within the city. The exercise of the power excluded the right to annex agricultural lands which are rural in character. The determination by the mayor and council that the lands being annexed were not agricultural lands rural in character is a legislative finding essential to the delegated legislative right to annex the lands. Likewise, the finding that such lands were contiguous or adjacent is a legislative finding necessary to the passage of a valid ordinance. While these legislative findings are necessary to the exercise of the right to annex by ordinance, they are a part of the exercise of the delegated legislative power and are in no sense of the word judicial in character. Since the motive, policy, wisdom, or expediency of legislation is for the Legislature and not the courts, the legislation is presumed constitutional until declared unconstitutional by a proper authority. But an appeal or error proceeding does not lie from a purely legislative act by a public body to whom legislative power has been delegated. If the jurisdictional findings of the legislative body to whom legislative powers have been delegated, such as the mayor and council in the instant case, are not true, and it is so established in a proper action, the ordinance is void as to anyone injured thereby for the reason that it takes property without due process of law.

181 Neb. at 239, 241-42, 147 N.W.2d at 781-82.

The validity of a legislative act from which there is no appeal is subject to judicial review through a collateral attack. *Reimer v. K N Energy, Inc.*, 223 Neb. 142, 388 N.W.2d 479 (1986). That is the judicial review contemplated by the act, and the only type of judicial review that could be provided by the act. Although the word "appeal" appears at some places in the act, there is no appeal in the technical sense from the action of the defendants in adopting rate ordinances, and there could not be.

This analysis is also supported by the legislative history of the act. During debate on the floor of the Legislature, Senator Landis, a cosponsor of the bill, stated: "A utility desiring judicial review of a municipalities [sic] action in setting natural gas rates is entitled to seek an injunction from the district court

in Lancaster County. The district court will conduct a de novo review of the municipalities [sic] action determining utility rates." Floor Debate, L.B. 663, Urban Affairs Committee, 90th Leg., 1st Sess. 6304 (May 26, 1987).

Later, when asked what items the cities gave up in negotiating the terms of the act, Senator Landis stated on the floor of the Legislature:

> I think most of all they would like to have had a review on the record so that the utility would be bound by the information which had previously been developed and available to the parties. We found, however, some very explicit language in the Williams case saying that this . . . the Legislature does not have the power to invest the courts with that level of authority because of a separation of powers argument that they are in fact were [sic] some constitutional limitations. That probably was significant to the cities.

Floor Debate, 90th Leg., 1st Sess. 6306 (May 26, 1987).

As a final statement of legislative intent, Senator Landis made the following statement just prior to the bill's final reading:

> A municipality acts in the legislative capacity when setting natural gas rates. Legislative acts are presumed valid. Generally, courts cannot inquire into the motive, policy, wisdom, or expediency of legislative acts. However, utility rates must be fair, reasonable, and compensatory, and municipalities must not set rates for natural gas which are arbitrary, unreasonable, or confiscatory. A municipality's legislative action in setting natural gas rates is subject to judicial review only through collateral attack by an equitable or injunctive action to determine whether the rates are fair, reasonable, and compensatory. A court may not set utility rates. A court may only judge whether the municipality acted within the scope of its legislative authority. The Municipal Natural Gas Regulation Act is intended to provide a framework within which municipalities can regulate, determine, and fix natural gas rates. A utility desiring judicial review of the municipality's action in setting natural gas rates is entitled

to seek such review by means of a collateral attack on the municipal action in the District Court of Lancaster County. Having reviewed the relevant Nebraska case law . . . and having reviewed constitutional concerns relating to due process and the separation of powers, the drafters have endeavored to ensure under this act that those remedies for judicial review available to utilities under current Nebraska law continue to be available upon adoption of this bill, and that the standards and scope of review under current law also remain intact.

Floor Debate, 90th Leg., 1st Sess. 6637-38 (May 29, 1987).

The contention of the defendants in this case is similar to that made by the defendant in *Erickson v. Metropolitan Utilities Dist.*, 171 Neb. 654, 107 N.W.2d 324 (1961). In the *Erickson* case, the issue was whether a rate established by the board of directors of the district was valid. The defendant district contended that if there was competent and relevant evidence before the district court to sustain the action of the district and on which evidence it could not be said that the action was arbitrary and unreasonable, the court could not of right declare the rate invalid. This contention was rejected because the district did not have powers similar to the railway commission. We stated:

In practice, if not by specific declaration, it has been the rule that public service corporations having power to adopt rules and regulations are required to exact reasonable requirements, the reasonableness of which may be inquired into in a full hearing in the courts. . . .

The conclusion reached is that the question of the validity of the exactions made by the district which are here for review was the proper subject of a full hearing de novo by the district court.

*Id.* at 660, 107 N.W.2d at 327-28.

The equity jurisdiction of the district court is granted by the Constitution and cannot be legislatively limited or controlled. *Village of Springfield v. Hevelone*, 195 Neb. 37, 236 N.W.2d 811 (1975). See, also, *Omaha Fish and Wildlife Club, Inc. v. Community Refuse, Inc.*, 208 Neb. 110, 112, 302 N.W.2d 379, 380 (1981), in which we held: "Jurisdiction in suits for

injunction are [sic] in the district courts. Neb. Const. art. 5, § 9. This cannot be legislatively limited or controlled."

These actions are suits in equity, similar to the *Erickson* case, which are collateral attacks upon the rate ordinances adopted by the defendants. The plaintiff had the burden to prove that the rates fixed by the defendants were arbitrary, unreasonable, and confiscatory. *Kansas-Nebraska Nat. Gas Co., Inc. v. City of Sidney*, 186 Neb. 168, 181 N.W.2d 682 (1970). To carry this burden the plaintiff had the right to offer any evidence which was relevant to the issue and was not limited to the evidence received at the area rate hearings. Since the trial court received nearly all of the evidence which was offered, and any evidence which was offered but not received appears in the record, the cases may be disposed of on the record made in the district court. The review in this court of the judgments of the district court is, of course, de novo on the record.

The remaining assignments of error relate to the rates which the defendants established by their rate ordinances. The plaintiff contends that the trial court erred in failing to find that the rates established by the defendants are unjust and unreasonable and in failing to enjoin the unjust and unreasonable rates established by the defendants.

The parties are in agreement that a reasonable rate of return on common equity for the plaintiff is 13.5 percent.

The controversy centers around the calculation of the cost of service and the determination of the plaintiff's capital structure and its common equity. The plaintiff contends that the rates adopted by the defendants are unjust, unreasonable, and confiscatory because of erroneous treatment of the following matters: (1) allocation of distribution costs to irrigators who are not within municipal boundaries and who do not use municipal distribution facilities; (2) allocation of some distribution costs on the basis of volume of gas sold rather than by the number of meters served; (3) inclusion of short-term debt as part of K N's capital structure, which reduced K N's requested rate of return on its common equity; (4) failure to include the cost of pension benefits as a cost of service to be allocated among the municipalities; (5) reduction of K N's cash working capital requirement from the approximately $7 million requested to a

negative requirement; (6) failure to include as a cost of service the amount of royalties paid for product extraction and the cost of unrecovered amounts of gas lost from the Huntsman storage field; and (7) amortization of the expense for filing for the rate increase over a period of 3 years instead of allowing K N to collect a 1-year surcharge to cover the rate case expense.

We sustain the plaintiff's contentions except as to the claimed working capital requirement and recovery of the rate case expense.

The plaintiff claims that as a result of the improper allocation of distribution costs by the defendants in calculating the cost of service, the rates which they adopted resulted in reduced revenue for the plaintiff in the amount of $493,314 for rate area 1, $147,669 for rate area 2, $89,790 for rate area 3, and $92,360 for rate area 4. This decrease in revenue decreased the plaintiff's return on common equity by 5.88 percent in rate area 1, 5.1 percent in rate area 2, 3.05 percent in rate area 3, and 3.37 percent in rate area 4. This claimed reduction in the plaintiff's return on common equity is based on its proposed capital structure, which also is a contested issue.

Briefly stated, the plaintiff contends that costs should be allocated to the customers who cause the utility to incur the costs. Edward Cecil, an engineer employed by R.W. Beck and Associates and who prepared the cost of service study for the plaintiff, testified concerning the allocation of distribution costs. Cecil testified that in allocating costs the basic principle is that costs should be allocated among customers who use the facilities. The basic concept is that customers who make use of transmission facilities should pay a portion of the cost of them. If a part of the system does not serve a customer, no costs of the part should be allocated to that customer. This is a generally accepted principle in the industry and is not unique to the plaintiff's case. Cecil testified that Dahlen and the cities violated this cost of service principle by allocating costs of facilities to customers who do not use the facilities. Cecil testified that Dahlen's allocation resulted in costs' being allocated away from customers who use the distribution facilities, and therefore, the costs appeared lower for those customers who were subject to the hearing than the actual costs

of providing service to those customers. The rates adopted by the cities are too low for the plaintiff to recover its costs of providing service.

With respect to the allocation of distribution costs, the plaintiff's principal complaint is that the defendants included irrigators in the group to which distribution costs were allocated. To understand the plaintiff's contention it is necessary to know how a gas company such as the plaintiff operates.

Gas is transported from the wells and gathering points through large pipelines, or mains, 10 to 16 inches in diameter, at high pressure. At the cities, the gas goes through a town border station, where the pressure is reduced from 800 psi (pounds per square inch) to 10 to 35 psi. The town border stations and equipment for sales at wholesale and industrial points are classified as transmission metering and regulating equipment. The gas then moves through a grid of distribution lines to the customer's location, where the pressure is again reduced to perhaps 4 ounces.

Distribution mains are laid out in a grid fashion to serve all customers on the system, so the number of customers using the system has a strong influence on the amount of investment in facilities.

Distribution costs are caused primarily by the number of customers on the system, although some weight should be given to the peak demands placed on the system by the customers served. Distribution costs are normally allocated on a customer basis or some combination of customers and demands during peak periods. Distribution costs should not be allocated on annual volumes because annual volumes do not cause the distribution costs to be incurred.

Irrigators use relatively large quantities of gas during their operating season and, ordinarily, cannot be served from a city distribution system because the pressures are inadequate to deliver gas in the quantities that the engine on an irrigation well pump requires. An irrigator can use service from a city distribution system if the well can function on 5 pounds of pressure. As a result, most irrigators, as well as large industrial customers, are served directly from transmission lines or from

irrigation transmission lines carrying gas at 100 to 300 psi. Thus, irrigators in general derive no benefit from city distribution systems, and city distribution costs should not be allocated to them.

Although the meters which irrigators use are classified as distribution facilities, the costs of those meters are allocated to the irrigators by the plaintiff.

There are approximately 10,000 irrigators in Nebraska, of which only 27 are inside city limits and only a few are downstream from city distribution systems. There are only 124 irrigation meters in rate areas 1, 2, 3, and 4 out of a total of 10,490 in Nebraska. These represent only 1 percent served by the plaintiff's facilities of all the irrigation meters in Nebraska. The vast majority of irrigation meters are in south central and north central Nebraska.

Of the 23 million MCF (thousand cubic feet) of gas sold at retail, irrigators used 5.5 million in a 30- to 45-day period in the summer. In comparison, an average domestic customer uses about 120 MCF per year.

The error in the allocation was compounded by the defendants' allocating distribution costs on a volume basis. When the costs are allocated by the number of meters, as the plaintiff proposed, rate areas 1, 2, 3, and 4 are allocated 27 percent of the total cost of providing service to Nebraska. Thirty-one percent of the municipal customers in Nebraska are located in the four rate areas involved in this case. The total sales for rate areas 1 through 4 was 4,079,121 MCF, or 18 percent of the total sales by volume.

The plaintiff's investment in facilities in the four rate areas totaled 32 percent of its total investment in distribution facilities in Nebraska. The number of meters in the four rate areas was 31 percent. There was a direct correlation of the investment dollars to the number of customers in the rate area. The costs associated with the distribution system are related to the number of customers served by the system.

The defendants used all irrigation meters as part of the denominator in both the allocation by number of meters and the volumetric allocation. The defendants included, in the volume of gas sold, commercial customers who are served from

transmission lines, not distribution lines, and who should not bear costs of the distribution facilities.

The size of the distribution mains cannot be based on the annual volumes, because if it were, the system would be too small to meet the peak demands. Larger pipe costs more money, so it is logical to allocate some of the costs on a demand basis. The annual volume of gas used has no influence on how the distribution system is laid out, but the system is influenced by the peak demands placed on it during the winter months.

The effect of the double allocation made by the defendants' using the wrong number of customers and allocating distribution costs by volume resulted in a cost allocation 11.4 percent lower than that produced by the plaintiff's allocation.

The plaintiff had requested a revenue increase of $886,472 for rate area 1, and the rates set by the defendants allowed only revenue of $230,981; the amount not allowed was $655,491. For rate areas 1, 2, 3, and 4, the plaintiff was unable to recover the following dollar amounts, specifically because of the different distribution cost allocation by Dahlen, which was adopted by the cities in setting the rates: area 1, $493,314; area 2, $147,669; area 3, $89,790; and area 4, $92,360. These amounts total $823,133·of the plaintiff's requested revenue increase of $1,784,527. Approximately half of the requested increase was disallowed because of the allocation factors used by the cities. The incorrect distribution allocations made by the defendants resulted in the rates set by the cities being unjust and unreasonable.

The controversy in regard to the plaintiff's capital structure is whether short-term debt and current maturities of long-term debt and preferred stock should be included as a part of the plaintiff's capital structure. The defendants adopted the recommendation of Dahlen and included short-term debt and current maturities of long-term debt and preferred stock as a part of the plaintiff's capital structure. The plaintiff claims that this resulted in a dilution of its rate of return on common equity and increased the risk factor to investors in the plaintiff's common stock.

It would appear that the determining factor in regard to this issue is whether the plaintiff used short-term debt to finance

assets which make up the rate base.

On September 30, 1985, the plaintiff had no short-term debt. On March 31, 1988, the short-term debt balance was $60.3 million, but during the same period, the rate base declined by $876,112. If short-term debt had been used to finance rate-base assets, the rate base would have increased.

Hassel Sanders, a certified public accountant and the plaintiff's vice president of rates and consolidated accounting, testified that the plaintiff does not finance its rate-base assets with short-term debt. The plaintiff's policy is to use only long-term debt to finance long-term assets. The Federal Energy Regulatory Commission (FERC) does not include short-term debt or current maturities in the capital structure of a company unless the corporation uses short-term debt to finance the rate base.

The plaintiff also offered the testimony of Professor R. Charles Moyer. Moyer, who is a professor of finance in the graduate school of management at Wake Forest University, and who has testified as an expert witness in many rate proceedings, testified about the plaintiff's capital structure and the components of capital upon which it could base its requested rate of return. At the time of trial, the plaintiff's short-term debt balance was $33.5 million. Moyer testified that short-term debt was not a regular portion of the plaintiff's financing, but was used primarily to handle seasonal cash-flow. During the heating season, the plaintiff has a large cash-flow, but after the heating season, cash-flow dwindles and the short-term debt balance builds up. In the last 2 or 3 years, because of seasonal and market changes, the plaintiff performed poorly financially. The current short-term debt balance is being reduced, and Moyer predicted that it would disappear over the next year. Moyer concluded that the plaintiff did not use short-term debt as a substantial, necessary, and regular portion of capital financing.

Moyer testified that some utility commissions and the FERC have included short-term debt in capital structure for three reasons: if the short-term debt is a substantial, necessary, and regular portion of a company's financing; if the short-term debt finances fixed assets includable in the rate base; and if it is

continuous in that it is rolled over regularly in similar amounts from time to time. The plaintiff's use of short-term debt does not meet any of these tests.

Moyer testified that the plaintiff does not use short-term debt to finance fixed assets includable in its rate base. On September 30, 1985, the plaintiff had no short-term debt and a net rate base of $220,814,444. As of March 31, 1988, the net rate base had declined to $219,938,332, but the plaintiff had a short-term debt balance of $60.3 million. The short-term debt could not have financed rate-base assets, since all assets were financed in 1985 when the company had no short-term debt outstanding. Moyer testified that the plaintiff does not roll over its short-term debt with new short-term loans when the old notes become due, but has used the short-term debt to finance fluctuating cash-flow needs.

Sanders testified that the plaintiff's capital structure for rate area 1 included the following components: (1) Long-term debt made up 37.45 percent of total capitalization, and the plaintiff requested a return of 9.93 percent in order to pay the effective interest rate on its 20-year debenture bonds; (2) preferred stock comprised 9.94 percent of the plaintiff's total capital structure, and the dividend return which had to be paid to preferred stockholders to prevent default was 7.49 percent; and (3) common equity was 52.61 percent of the plaintiff's capital structure and was defined as the remaining balance of return dollars available to pay dividends to common stockholders and to reinvest in gas plant additions to continue providing service.

Sanders testified that of the $9.8 million rate base for rate area 1, common stockholders have provided $5,171,940 of the rate base. The final rates adopted by the cities in that area gave common stockholders only 2.69 percent return. From the rate-base amounts for each element of the capital structure, the plaintiff determined the weighted cost of capital by dividing the total return dollars using the rates adopted by the cities. The result for area 1 was that the plaintiff was earning only 5.88 percent. For rate areas 2, 3, and 4, the plaintiff determined it would earn returns of 6.28 percent, 7.31 percent, and 6.8 percent, respectively, on common equity.

Professor Moyer has had experience with utility ratemaking

as an expert on determining capital structure, costs of equity, stream of working capital, and financial liability and integrity. The costs of debt components of capital are usually noncontroversial in that they are embedded costs—such as the costs of interest paid on bonds or dividends paid on preferred stock. The cost of common equity changes over time depending on conditions in capital and financial markets. That cost of common equity is the return that ultimately accrues to shareholder investors in the corporation.

Moyer testified that a fair rate of return is one that permits a company to maintain its financial integrity and attract capital on reasonable terms and that permits the company to achieve a level of return comparable to other firms with corresponding risk. Moyer testified that this definition was developed by the Bluefield Water Works and Hope Natural Gas cases. In *Bluefield Co. v. Pub. Serv. Comm.*, 262 U.S. 679, 43 S. Ct. 675, 67 L. Ed. 1176 (1923), the U.S. Supreme Court held that a public utility is, under the due process clause of the federal Constitution, entitled to the independent judgment of the court as to both law and facts upon review of rates fixed by a public service commission. The Court said:

> The prescribing of rates is a legislative act. The commission is an instrumentality of the State, exercising delegated powers. Its order is of the same force as would be a like enactment by the legislature. If, as alleged, the prescribed rates are confiscatory, the order is void. Plaintiff in error is entitled to bring the case here on writ of error and to have that question decided by this court.

262 U.S. at 683.

> The question in the case is whether the rates prescribed in the commission's order are confiscatory and therefore beyond legislative power. Rates which are not sufficient to yield a reasonable return on the value of the property used, at the time it is being used to render the service are unjust, unreasonable and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment. This is so well settled by numerous decisions of this Court that citation of the cases is scarcely necessary.

262 U.S. at 690.

A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility, and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time, and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally.

262 U.S. at 692-93.

In *Power Comm'n v. Hope Gas Co.*, 320 U.S. 591, 603, 64 S. Ct. 281, 88 L. Ed. 333 (1944), the U.S. Supreme Court said:

The rate-making process under the Act, i.e., the fixing of "just and reasonable" rates, involves a balancing of the investor and the consumer interests. Thus we stated in the *Natural Gas Pipeline Co.* case that "regulation does not insure that the business shall produce net revenues." 315 U. S. p. 590. But such considerations aside, the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. Cf. *Chicago & Grand Trunk Ry. Co. v. Wellman*, 143 U. S. 339, 345-346. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be

sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.

Moyer testified that an optimal capital structure for a corporation is one which finds a weighted cost of capital which balances debt and equity, minimizing the cost of capital. The weighted cost of capital is the cost of each component source of capital times the percent that it exists in the firm's capital structure.

Moyer testified that the cost of common equity ultimately determines the financial liability, integrity, and ability of a company to attract capital in financial markets. Once the cost is estimated, it is multiplied by the equity portion of the rate-base assets, which have been financed with equity to get the return dollars needed to provide cash to the equity investors. If the rate of return on equity is inadequate because of too low rates, the ability of a company to attract capital and provide service is impaired. If a corporation does not maintain rates of return competitive with other investments of similar level of risk, an investor will turn elsewhere in the investment market and buy another security.

The capital structure of a company is the permanent source of financing which is used to finance long-term or rate-base assets. Its components include long-term capital as well as long-term preferred and common stock, plus all common equity of the company. A company with 50 percent equity is less risky than a company with 35 percent equity.

In evaluating the rates adopted by the defendant cities, Moyer concluded that none of the rates would provide the level of return that investors can get from other utility companies in the natural gas industry. Moyer concluded that the rates were unfair, unreasonable, and confiscatory. He compared the rate of return allowed the plaintiff by the cities' rates to the return paid on U.S. Government bonds, the lowest risk security. The plaintiff's return was even lower than the return on Government bonds.

Moyer stated that using Dahlen's capital structure, one would have to make a substantial upward adjustment in the required rate of return on equity to reflect the greater financial

risk embedded in the financial structure. In looking at the risk of a company, one compares the amount of debt capital and the amount of equity capital. The greater the proportion of equity, the lower the chance that the company will have financial difficulties. The greater the proportion of common equity, the less volatile earnings will be as operating income increases. The use of more debt in a capital structure increases the volatility of earnings, which is a risk an investor must consider. Investors would demand a higher rate of return if short-term debt was included in the plaintiff's capital structure. He stated that the rates established by the municipalities would impact investors' risk perception of the plaintiff. Fluctuating short-term debt is not a material factor in evaluation of the risk of the company because it is a temporary source of financing.

There is no mention in the Municipal Natural Gas Regulation Act of short-term debt as a component of capital structure to be considered in establishing a rate of return. The act provides that as part of the information to be provided a municipality, the utility must show:

Rate-of-return and cost-of-capital schedules showing:

(a) Long-term debt, preferred stock, and common equity amounts, ratios, and percentage cost rates for the base year and test year; and

(b) Long-term debt, preferred stock, and common equity amounts at the beginning and end of the base year and test year . . . .

§ 19-4611(5). The utility must also provide rate-base schedules showing beginning and ending balances for the base year and test year of, among other things, "[o]ther rate-base components." § 19-4611(3)(c). The statute makes no other mention of short-term debt as a cost of capital or a consideration in finding a proper rate of return.

As a result of the inclusion of short-term debt and current maturities of long-term debt and preferred stock in the plaintiff's capital structure, the rates adopted by the defendants had the effect of reducing the rate of return on common equity by 1.92 percent for area 1, 1.94 percent for area 2, 2 percent for area 3, and 1.99 percent for area 4.

The issue with regard to pension expense resulted from the

failure of the defendants to include $1,787,712 as a part of the cost of service. This was due in part to confusion caused by the failure of the plaintiff to include this item in the original application and adequately explain this item at the time of area rate hearings.

Part of the problem was caused by a Financial Accounting Standards Board rule that required a portion of the pension expenses to be recorded as prepaid items.

The defendants adopted Dahlen's recommendation of $195,000 as pension expense and further compounded the error by reducing that amount by $90,000.

The plaintiff's actual pension expense for the year ending April 30, 1987, was $2,073,761, and the test year amount was $1,982,896. Pension expense is a legitimate labor expense and should be included as a part of the cost of service. The failure to include the proper amount as pension expense as a cost of service reduced the plaintiff's requested rate of return by 1.4 percent, 1.45 percent, 1.45 percent, and 1.95 percent for rate areas 1, 2, 3, and 4, respectively, based on the plaintiff's proposed capital structure, and reduced by about 10 percent the plaintiff's requested return of 13.5 percent. Alone, this was not a significant factor, but when considered with the distribution allocation and capital structure issues, it contributed to making the rates adopted by the cities unjust and unreasonable.

The issues as to royalties on product extraction and Huntsman unrecovered storage gas resulted from the plaintiff's inadvertent failure to include these items in its application. These items were noted in the rebuttal report and evidence concerning them was presented at the rate area hearings and at the trial in the district court.

At the trial, Sanders testified that the royalties on products extracted were the royalty obligation which the plaintiff pays to the owners of the gas stream for liquids extracted from the gas stream. These products are subsequently sold by the plaintiff and the proceeds credited back to reduce the cost of service. Sanders testified that the royalty obligation for system-wide products extracted was $1,844,393 and for rate area 1 was $26,751. Sanders testified that was a cost of service and to exclude the cost reduced the plaintiff's rate of return on

common equity.

Sanders explained that the Huntsman unrecovered storage expense concerned the Huntsman underground storage field in western Nebraska, where the plaintiff stores gas in the off-season. The costs were the cost of gas that migrated from the Huntsman storage field into an adjacent field. Huntsman sued Marathon Oil, the operator of the adjacent field, to recover the cost of the lost gas and settled with Marathon for $11 million. However, that settlement did not recoup the entire value of the gas, and the administrative law judge in that case found that the $2.1 million in remaining value could be recovered over a period of 5 years.

The failure to include these two items as a cost of service reduced the plaintiff's rate of return on common equity by .48 percent, .48 percent, .44 percent, and .64 percent for rate areas 1, 2, 3, and 4, respectively.

The defendants were aware of the exclusion of the Huntsman unrecovered storage amounts and the royalties on products extraction at the time the plaintiff's rebuttal report was filed on January 7, 1988. The rate area hearings were held later that month. The defendants had time to respond to the revised cost of service study prepared by the plaintiff, and the amounts should have been included as a cost of service and allocated to the rate areas in question. The failure to do so magnified the unjust and unreasonable rates adopted by the cities.

The remaining two items in dispute relate to the plaintiff's claim that $7 million should have been included as the cost of working capital and that it should have been allowed to recover the rate case expense in 1 year rather than over a 3-year period. We find that neither contention has merit.

With respect to the working capital issue, the plaintiff relied on a rule that assumes that a utility carries its customers for a 45-day period before it collects from its customers. The FERC now requires utility companies to perform full lead-lag studies if they request positive cash working capital. If no lead-lag study is performed, the FERC presumes a zero cash working capital.

Sanders testified that cash working capital is an investment in funds necessary to pay bills as they come due prior to the time

the cash is collected from customers. If there is a cash working capital requirement, it is relevant to the rate base and can be included as a cost of service. The plaintiff used the one-eighth formula, also called the 45-day rule, to determine its cash working capital needs.

A lead-lag study determines what the actual working capital requirement is, if any. The lead is the period of time between when the plaintiff receives supplies and goods and the time it pays for the goods. Lag is the time period between when the plaintiff renders service to the customer and the time it collects the bill for the service.

Although the study made by Dahlen may have been unreliable, that did not establish that the plaintiff had a positive working capital requirement.

As to rate case expense, the rates adopted by the defendants allow the plaintiff to recover the expense of the rate case by a surcharge made over a period of 3 years. The plaintiff proposed a 1-year surcharge to recover the rate case expense. The plaintiff claims that the rate case expense affects the plaintiff's return on common equity by reducing it .27 percent, .27 percent, .26 percent, and .37 percent for rate areas 1, 2, 3, and 4, respectively. Apparently, this reflects what the plaintiff would lose on interest earned if the funds were collected in 1 year. Sanders admitted, however, that the plaintiff would still recover the proper amount if the surcharge was spread over a 3-year period.

The statute does not provide any specific method for utilities to collect rate case expense, except to allow for its collection. § 19-4617(1)(b). It is reasonable that the surcharge be amortized to reflect the actual cost of the rate case expense.

The trial court found that the cities' taking Dahlen's suggestion and amortizing the rate case expense over 3 years was not arbitrary or unreasonable. We reach the same conclusion.

From our de novo review of the record, we conclude that the rates adopted by the defendants in rate areas 1, 2, 3, and 4 are unreasonable and confiscatory. The judgments are reversed and the causes remanded with directions to enter judgments granting the plaintiff the injunctive relief requested.

REVERSED AND REMANDED WITH DIRECTIONS.

SHANAHAN, J., concurring.

Injunctive relief for K N Energy, Inc., is the correct disposition of this appeal. However, in reaching the correct result, the majority refers to the content of the Nebraska Municipal Natural Gas Regulation Act, Neb. Rev. Stat. §§ 19-4601 et seq. (Reissue 1987), enacted in 1987; for example, "There is no mention in [the act] of short-term debt as a component of capital structure to be considered in establishing a [reasonable] rate of return," and "The statute makes no other mention of short-term debt as a cost of capital or a consideration in finding a proper rate of return." By those and other references to the content of the Nebraska Municipal Natural Gas Regulation Act, the majority has attributed unnecessary and unwarranted significance to the act in relation to this appeal.

Quite apart from the Nebraska Municipal Natural Gas Regulation Act, the true foundations for injunctive relief regarding a utility rate are the guarantee of due process, see Neb. Const. art. I, § 3, and U.S. Const. amend. XIV, and a district court's constitutionally conferred equity jurisdiction, namely: "The district courts shall have both chancery and common law jurisdiction . . . ." Neb. Const. art. V, § 9.

On several occasions, this court has reiterated the longstanding constitutional premise that pursuant to the power conferred by Neb. Const. art. V, § 9, a district court has equity jurisdiction, which exists independent of statute and is exercisable without legislative enactment. See, *State, ex rel. Sorensen, v. Nebraska State Bank*, 124 Neb. 449, 247 N.W. 31 (1933); *State v. Odd Fellows Hall Ass'n*, 123 Neb. 440, 243 N.W. 616 (1932); *Hall v. Hall*, 123 Neb. 280, 242 N.W. 607 (1932); *Matteson v. Creighton University*, 105 Neb. 219, 179 N.W. 1009 (1920).

In *Bluefield Co. v. Pub. Serv. Comm.*, 262 U.S. 679, 690, 43 S. Ct. 675, 67 L. Ed. 1176 (1923), the U.S. Supreme Court stated: "[W]hether the rates prescribed in the commission's order are confiscatory and therefore beyond legislative power" depends on whether the imposed rates are "confiscatory, and their enforcement deprives the public utility of its property in violation of the Fourteenth Amendment." Injunctive

protection for a utility concerning a confiscatory rate was acknowledged in *Kansas-Nebraska Natural Gas Co. v. City of St. Edward*, 167 Neb. 15, 23, 91 N.W.2d 69, 74 (1958), when this court recognized the availability of an injunction as part of a district court's equity jurisdiction to prevent " 'unreasonable delay in putting an end to confiscatory rates . . . .' " (Quoting from *Smith v. Ill. Bell Tel. Co.*, 270 U.S. 587, 46 S. Ct. 408, 70 L. Ed. 747 (1926).)

After an examination of the Nebraska Municipal Natural Gas Regulation Act in relation to the present appeal, the words of Daniel Webster, echoing Brougham's observation, are indeed appropriate: "What is valuable is not new, and what is new is not valuable." The valuable constitutional role of the judiciary in connection with the ratemaking process is not new. See, *Bluefield Co. v. Pub. Serv. Comm., supra*; *Kansas-Nebraska Natural Gas Co. v. City of St. Edward, supra*. The recently enacted Nebraska Municipal Natural Gas Regulation Act has little value, if any at all, concerning judicial activity in reference to the ratemaking process, which still remains a legislative function or activity. See *Kansas-Nebraska Nat. Gas Co., Inc. v. City of Sidney*, 186 Neb. 168, 181 N.W.2d 682 (1970). Any legislative attempt to involve a court in establishing a utility rate has serious constitutional implications.

Under the circumstances in the present appeal, municipal failure to adopt an ordinance affording a reasonable rate of return on the value of K N's property used for public service imposed a confiscatory rate on K N and is state action which deprives K N of its property, contrary to the constitutional guarantee of due process. Injunctive relief prevents such unconstitutional confiscation.

Even if the Nebraska Municipal Natural Gas Regulation Act had never been enacted, the injunction granted to K N would be constitutionally authorized and available in a district court's equity jurisdiction. Any use of the act to determine the present appeal is seduction by legislation.

CAPORALE, J., joins in this concurrence.