LYLE STONEMAN ET AL., APPELLEES, V. UNITED NEBRASKA BANK ET AL., APPELLANTS, AND DEPARTMENT OF BANKING AND FINANCE OF THE STATE OF NEBRASKA ET AL., APPELLEES.

577 N.W. 2d 271

Filed April 17, 1998. No. S-96-941.

Gerald P. Laughlin and Tiffany L. Seevers, of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, for appellants.

Terry R. Wittler, Larry A. Holle, and Jill Gossin Jensen, of Cline, Williams, Wright, Johnson & Oldfather, for appellees Stoneman et al.

WHITE, C.J., CONNOLLY, GERRARD, and McCORMACK, JJ., and ENDACOTT, D.J., and GRANT and FAHRNBRUCH, JJ., Retired.

CONNOLLY, J.

The issue in this appeal presents the question of whether the minority shareholders of a banking corporation who are "cashed out" via merger have a right to receive fair value for their shares, notwithstanding bank minority shareholders' exclusion from Neb. Rev. Stat. § 21-20,138 (Reissue 1997). We conclude that bank shareholders do indeed have such a right, and we affirm.

## I. BACKGROUND

Lexington State Bank & Trust Co. (LSB&T), then a Nebraska banking corporation, was a subsidiary of Lexington Bancshares, Inc. (LBI), then a Nebraska holding company, which owned 88.5 percent of LSB&T's issued and outstanding shares. United Nebraska Bank (UNB), also a Nebraska banking corporation, was a wholly owned subsidiary of United Nebraska Financial Company (UNFC), another Nebraska holding company. UNB, LBI, UNFC, and LSB&T are the appellants in the instant case. Harold P. Stuckey, acting as president of both LSB&T and LBI, contacted UNB regarding the sale of LBI. UNB's parent corporation, UNFC, submitted an offer to LBI, which resulted in two stock purchase agreements, an "Agreement for Purchase of Preferred Shares of Lexington Bancshares, Inc." (preferred share agreement) and an "Agreement for Purchase of Common Shares of Lexington Bancshares, Inc." (common share agreement).

## 1. Stock Purchase Agreements

The preferred share agreement was between UNFC and the holders of LSB&T's preferred shares. UNFC's purchase of LBI's preferred shares was to occur contemporaneously with UNFC's purchase of LBI's common shares, and all conditions precedent under the common share agreement were to be met or waived by LBI prior to closing.

The common share agreement was between UNFC and certain individuals, including Lexington Bank and Trust Co., trustee of LSB&T's employee stock ownership plan. In the common share agreement, UNFC agreed to purchase all of LBI's common shares, conditioned upon the closing of the purchase of LBI's preferred shares and the "obtaining [of] all necessary regulatory approvals including approval for [UNFC] to merge [LSB&T] into its [sic] subsidiary bank."

In addition, UNFC agreed to purchase 439.01 shares of LSB&T's common stock owned by Stuckey for $470,713, payable at closing, which would yield $1,072 a share. Stuckey was also to be paid "an amount equal to any cash recoveries by [LSB&T] of the principal amount of and interest on a loan by [LSB&T] . . . in the principal amount of $156,000, which loan was charged off in full by [LSB&T]." Finally, the common share agreement required Stuckey to execute an agreement not to compete, for which Stuckey would be compensated in the amount of $450,000.

Upon the closing of the sale of LBI's common shares and Stuckey's 439.01 shares in LSB&T, UNFC would control all but 8.4 percent of LSB&T's issued and outstanding shares. Although the common share agreement clearly contemplated a merger and provided for the purchase of Stuckey's minority shares in LSB&T, it made no provisions concerning LSB&T's remaining minority shareholders.

The purchase price of LBI's shares provided for in the common share agreement was based upon LSB&T's equity capital.

The value of [LSB&T] shall be determined by adding to the amount of [LSB&T's] equity capital . . . the amount of $8,250,000, provided that [LSB&T's] equity capital . . . is not less than $8,800,000. The value of [LSB&T] as thus computed shall be divided by the *total number of shares* of

[LSB&T] common stock issued and outstanding, which shall then be multiplied by the number of [LSB&T] shares owned by [LBI] to determine the value of the [LSB&T] shares owned by [LBI].

(Emphasis supplied.) Application of the above formula resulted in a value of approximately $1,217.86 per LSB&T share.

### 2. MERGER AGREEMENT

In yet another separate agreement, LSB&T agreed to merge with UNB, which merger was to occur contemporaneously with the consummation of the stock purchase agreements. The merger was to proceed in three steps. First, the stock purchase agreements would be executed. Second, LBI would merge with UNFC with LBI surviving, resulting in LBI acquiring all of UNB's outstanding voting shares. Third, UNB and LSB&T would merge, with UNB as the survivor, and LBI would change its name to UNFC. Upon completion of the third step, all out-standing voting shares of LSB&T were to be canceled, with the minority shareholders receiving $700 per share in cash, and each share of common stock owned by LBI was to be converted into 1.91 shares of UNFC's common stock. The above transac-tions would result in UNFC's being a one-bank holding com-pany, with UNB as its wholly owned subsidiary.

These transactions effected a "cash-out" merger, which left the minority shareholders with no equity in the resultant corpo-ration. A cash-out merger may be accomplished without regard to the wishes of the minority shareholders and forces them to accept cash for their shares rather than stock in the newly merged business, thus giving the majority 100-percent control. Such mergers are variously referred to as "cash-outs," "take-outs," "squeeze-outs," and "freeze-outs."

### 3. DEPARTMENT'S APPROVAL

The stock purchase agreements and the merger agreement required the approval of the Nebraska Department of Banking and Finance (Department) prior to their consummation, pur-suant to Neb. Rev. Stat. §§ 8-157(3) (Supp. 1995) and 8-1502 (Reissue 1997). UNFC submitted a notice of acquisition and control to the Department, pursuant to § 8-1502, to obtain approval for the stock purchase agreements. The Department

gave notice to UNFC that it had no objection to the change in control that would result from UNFC's purchase of LBI's stock. Upon receiving the above notice, UNFC submitted an application for merger to the Department. In response to the application for merger, several minority shareholders (appellee minority shareholders) submitted a protest and petition for declaratory ruling to the Department. They included Lyle Stoneman, since deceased and substituted for by Michael Alesio; Virginia Ann Hanson, sole beneficiary of the Maurice Braithwait Trust; and First Gothenburg Bancshares, Inc., a Nebraska corporation. They protested the value they would receive for their LSB&T shares under the merger application and requested a hearing on the matter. UNB (not UNFC) filed an answer to the protest, and the appellee minority shareholders responded with a brief in support of their position. UNB then filed a reply brief.

The Department issued an order simultaneously approving the merger application and denying the appellee minority shareholders a hearing. The Department noted that it considers the "fundamental fairness" of a merger to the minority shareholders as a factor when deciding whether to approve a merger application. However, the Department stated that its review does not require that the minority shareholders receive value equal to that of the majority. The Department found that LSB&T's minority shareholders were to receive " 'book value' " for their shares, which does not "violate the concept of fundamental fairness."

#### 4. DISTRICT COURT

Dissatisfied with the Department's order, the appellee minority shareholders appealed to the district court under the Administrative Procedure Act (APA), alleging that the Department violated due process by denying them a hearing and by finding that the merger would not violate the concept of " 'fundamental fairness.' " Concluding that the Department acted in a quasi-judicial manner, the district court reversed the Department's order and remanded the matter with directions to conduct a hearing.

### II. ASSIGNMENTS OF ERROR

The appellants argue that the district court erred in (1) granting judicial review of the Department's order pursuant to the

APA; (2) reversing the Department's order and remanding the matter to the Department for hearing, because to the extent the appellee minority shareholders were entitled to due process, they received due process from the Department; (3) reversing the Department's order and remanding the matter to the Department for hearing, because under Nebraska law, minority shareholders of banks are not entitled to dissenters' rights; and (4) disturbing the Department's determination that the price the appellee minority shareholders received for their shares in LSB&T did not violate fundamental fairness.

## III. SCOPE OF REVIEW

When the court from which an appeal was taken lacks jurisdiction, the appellate court acquires no jurisdiction. *Becker v. Nebraska Acct. & Disclosure Comm.*, 249 Neb. 28, 541 N.W.2d 36 (1995).

The question of jurisdiction is a question of law, upon which an appellate court reaches a conclusion independent of the trial court; however, findings of the lower court as to underlying factual disputes, if any, in regard to the jurisdictional issue will be upheld unless they are clearly erroneous. *Walksalong v. Mackey*, 250 Neb. 202, 549 N.W.2d 384 (1996).

On questions of law, an appellate court has an obligation to reach its own independent conclusions. *Anderson/Couvillon v. Nebraska Dept. of Soc. Servs.*, 248 Neb. 651, 538 N.W.2d 732 (1995).

## IV. ANALYSIS

### 1. Appeal Pursuant to APA

As a threshold matter, we must address the appellants' assertion that the district court erred in granting judicial review of the Department's order pursuant to the APA. The appellants argue that the district court did not have jurisdiction in the instant case because the case was not "contested." Thus, to determine whether the district court had jurisdiction under the APA, we must determine whether the instant case was "contested," see *Gretna Public School v. State Board of Education*, 201 Neb. 769, 272 N.W.2d 268 (1978), and whether the appellee minority shareholders were "aggrieved," see *Karnes v. Wilkinson Mfg.*, 220 Neb. 150, 368 N.W.2d 788 (1985). "Any

person aggrieved by a final decision in a contested case, whether such decision is affirmative or negative in form, shall be entitled to judicial review under the Administrative Procedure Act." Neb. Rev. Stat. § 84-917 (Reissue 1994).

### (a) Contested

For purposes of the APA, a "contested case" is defined as "a proceeding before an agency in which the legal rights, duties, or privileges of specific parties are required by law or constitutional right to be determined after an agency hearing." Neb. Rev. Stat. § 84-901(3) (Reissue 1994). This court has held that "a proceeding becomes a contested case when a hearing is required." *Central Park Pharm. v. Nebraska Liq. Cont. Comm.*, 216 Neb. 676, 678, 344 N.W.2d 918, 920 (1984), citing *J K & J, Inc. v. Nebraska Liquor Control Commission*, 194 Neb. 413, 231 N.W.2d 694 (1975). This court has also held that when an administrative body acts in a quasi-judicial manner, due process requires notice and an opportunity for a full and fair hearing at some stage of the agency proceedings. *City of Lincoln v. Twin Platte NRD*, 250 Neb. 452, 551 N.W.2d 6 (1996). Therefore, if the Department acted in a quasi-judicial manner, the instant case was "contested." See *Slack Nsg. Home v. Department of Soc. Servs.*, 247 Neb. 452, 528 N.W.2d 285 (1995).

Generally, "[t]he exercise of discretion to grant or deny a license, permit or other type of application is a quasi-judicial function." *Sommerfield v. Helmick*, 57 Cal. App. 4th 315, 320, 67 Cal. Rptr. 2d 51, 54 (1997). See, also, *J K & J, Inc. v. Nebraska Liquor Control Commission, supra.* In *First Fed. Sav. & Loan Assn. v. Department of Banking*, 187 Neb. 562, 566, 192 N.W.2d 736, 739 (1971), we held that the Department must hold a hearing when determining whether to approve or deny an application to establish a savings and loan pursuant to Neb. Rev. Stat. "section 8-331, R. R. S. 1943." This court's holding was based upon its conclusion that the Department's determination was quasi-judicial. *First Fed. Sav. & Loan Assn. v. Department of Banking, supra.* In the instant case, the Department's approval of a banking application was once again required, and as such, its action was quasi-judicial. See, also, *Phelps County Savings Co. v. Dept. of Banking & Finance*, 211 Neb. 683, 320

N.W.2d 99 (1982); *Southwestern Bank & Trust Co. v. Dept. of Banking and Finance*, 206 Neb. 599, 294 N.W.2d 343 (1980); and *North Loup River P. P. & I. Dist. v. Loup River P. P. Dist.*, 162 Neb. 22, 74 N.W.2d 863 (1956).

### (b) Aggrieved

This court addressed whether a person has been "aggrieved" by an agency decision in *Karnes v. Wilkinson Mfg., supra.* In *Karnes*, this court held that the Tax Commissioner was not a "person aggrieved" because she sat on the same board that rendered the decision she intended to challenge. In so holding, we couched the issue in terms of standing, noting that the phrase "person aggrieved" is not defined by the APA.

Clearly, the appellee minority shareholders in the instant case have standing. See *Schmid v. Clarke, Inc.*, 245 Neb. 856, 515 N.W.2d 665 (1994). In *Schmid*, we indicated that the Department had the authority to review a merger application for fairness to the minority shareholders and that if the minority shareholders of a bank fail to object to the merger before the Department, they have waived their rights and are estopped from bringing a claim in the district court. Had the shareholders in *Schmid* been without standing, their failure to object before the Department would not have waived their right to receive fair value or estopped them from asserting that right. See, also, *First Fed. Sav. & Loan Assn. v. Department of Banking, supra.*

Because the instant case was contested and the appellee minority shareholders were persons aggrieved, we conclude that the district court properly asserted jurisdiction pursuant to the APA.

### 2. APPELLEE MINORITY SHAREHOLDERS' RIGHT TO DISSENT AND RECEIVE FAIR VALUE

Having concluded that the district court properly asserted jurisdiction and that the appellee minority shareholders were entitled to notice and a hearing, we address the appellants' remaining assignments of error, as they will likely arise on remand before the Department.

Section 21-20,138, governing dissenters' rights, specifically excludes bank shareholders from it purview. Thus, in their third assignment of error, the appellants assert that pursuant to

§ 21-20,138, the appellee minority shareholders have no right to dissent and receive fair value for their shares. The appellee minority shareholders, however, contend that such shareholders do have the right to dissent and receive fair value despite the statutory exclusion in § 21-20,138. According to the appellee minority shareholders, that right must be enforced by the Department, which cannot approve a merger application unless that merger will accord the minority shareholders fair value for their shares. Accordingly, the issue is whether § 21-20,138 denies the appellee minority shareholders the right to recover fair value for their shares and if not, whether the Department is required to enforce such rights by denying the merger application in the event that it determines the appellee minority shareholders did not receive fair value. To dispose of these issues, we must determine the scope of § 21-20,138 and the parameters of the Department's authority to approve or deny a merger application.

### (a) Scope of § 21-20,138

Section 21-20,138 states:

A shareholder shall be entitled to dissent from, and obtain payment of the fair value of his or her shares in the event of . . .

. . . [c]onsummation of a plan of merger to which the corporation is a party:

. . . .

. . . If the corporation is a subsidiary that is merged with its parent . . . .

. . . .

. . . *The right to dissent and obtain payment under sections 21-20,137 to 21-20,150 shall not apply to the shareholders of a bank* . . . or the holding company of any such bank . . . .

(Emphasis supplied.) Thus, according to § 21-20,138's plain language, the appellee minority shareholders have no statutory right to dissent and receive fair value for their shares.

That the appellee minority shareholders have no statutory right does not mean that they have no rights at all. Statutes which effect a change in common law or take away a common-law right should be strictly construed, and a construction which restricts or removes a common-law right should not be adopted

unless the plain words of the statute compel it. *Guzman v. Barth*, 250 Neb. 763, 552 N.W.2d 299 (1996). Section 21-20,138 does not purport to abrogate the common-law rights of shareholders to dissent and receive fair value for their shares. Rather, by its explicit language, the statute excepts the shareholders of a banking corporation only from "[t]he right to dissent and obtain payment *under sections* 21-20,137 to 21-20,150 . . . ." Thus, construed strictly, § 21-20,138(3) appears to abrogate only statutory rights, leaving untouched those rights and remedies that were available to such shareholders at common law.

Even were we to conclude that § 21-20,138 abrogated bank shareholders' common-law rights, which conclusion we need not reach, such a construction would apply only to causes in law, not those in equity. "Common-law rights" include both those rights sounding in law and those sounding in equity. See *Synacek v. Omaha Cold Storage*, 247 Neb. 244, 526 N.W.2d 91 (1995). In Nebraska, the "equity jurisdiction of the district court is granted by the Constitution and cannot be legislatively limited or controlled." *K N Energy, Inc. v. City of Scottsbluff*, 233 Neb. 644, 653, 447 N.W.2d 227, 234 (1989). See, also, Neb. Const. art. V, § 9; Neb. Rev. Stat. § 49-101 (Reissue 1993). To the extent § 21-20,138 is an adequate remedy, equity does not apply, *Pilot Investment Group v. Hofarth*, 250 Neb. 475, 550 N.W.2d 27 (1996), but to the extent that the statute's remedy is incomplete, equity must intervene, regardless of whether the statute purports to abrogate the common law, see *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983).

Section 21-20,138 does not provide an adequate remedy to the minority shareholders of a banking corporation, since it explicitly excludes them from the right to receive fair value for their shares. Thus, if the shareholders of a banking corporation have the equitable right to receive fair value for their shares, we need not determine whether § 21-20,138 abrogated whatever additional common-law legal rights those shareholders might otherwise have.

### (b) Shareholders' Equitable Rights

At common law, a corporation could not effect a merger without the unanimous consent of its stockholders. See, e.g., *Shidler v. All American Life & Financial Corp.*, 775 F.2d 917

(1985); *Botts v. Simpsonville & B. C. Turnpike Co.*, 10 Ky. L. Rptr. 669, 10 S.W. 134 (1888). In *McLeod v. Lincoln Medical College*, 69 Neb. 555, 559, 98 N.W. 672, 673 (1904), this court addressed the propriety of a squeeze-out merger at common law: "No man can be compelled to dispose of his stock in a corporation, or *other* property interests, because, in the judgment of the parties so compelling him, it is for his interest financially and otherwise so to do." (Emphasis supplied.) Accordingly, this court held that the merger was void ab initio. *Id.*

Many courts, however, recognized the potential abuse inherent in requiring unanimous stockholder consent prior to the consummation of a merger. See *Tanner v. Lindell Ry. Co.*, 180 Mo. 1, 79 S.W. 155 (1904) (addressing this issue in context of sale of assets). When unanimous consent was required, a single shareholder, even one who owned a single share, could block the merger of an entire corporation. *Id.* As the *Tanner* court stated, "Because all the stockholders have not consented to the sale it does not follow that the sale will be set aside regardless of the consequences." *Tanner v. Lindell Ry. Co.*, 180 Mo. at 17, 79 S.W. at 158. Thus, the court held:

> [T]he minority stockholders . . . may have out of the proceeds of the sale . . . the market value of their stock at the date of the sale or their proportional share of the proceeds . . . and, if the transaction be made with bad faith, they may, under some circumstances . . . have the sale set aside and a rehabilitation of the corporation, or, if equity requires it, and the application is timely . . . they may have an injunction to arrest the transaction.

*Id.* at 21-22, 79 S.W. at 159-60. The holding in *Tanner* demonstrates that minority shareholders have the right to dissent and receive fair value for their shares in equity, even in the absence of a statutory right. See, also, e.g., *Gabhart v. Gabhart*, 267 Ind. 370, 370 N.E.2d 345 (1977); *Wunsch v. Consolidated Laundry Co.*, 116 Wash. 44, 198 P. 383 (1921); *Winfree v. Riverside Cotton Mills*, 113 Va. 717, 75 S.E. 309 (1912). Moreover, that equitable right could be invoked as readily in the banking context as in any other. *Equitable Trust Co. v. Columbia National Bank*, 145 S.C. 91, 142 S.E. 811 (1927). See, also, *Baugh v.*

*Citizens & Southern National Bank*, 248 Ga. 180, 281 S.E.2d 531 (1981) (applying dissenter's rights statute).

The appellee minority shareholders' contention that the shareholders of a bank retain rights in equity, regardless of the absence of a right to receive payment under the dissenters' rights statute, was implicitly recognized in *Schmid v. Clarke, Inc.*, 245 Neb. 856, 515 N.W.2d 665 (1994). In *Schmid*, the minority shareholders of a bank that was to be merged out of existence were to receive $3.75 per share of stock and an additional $1.50 per share if they signed a covenant not to compete. Two shareholders brought an action against the bank's holding company, the holding company which purchased the bank, and the subsidiary of the latter holding company, alleging theories of conspiracy, *breach of fiduciary duty*, restraint of trade, and contract, all of which were apparently based upon the covenant not to compete. The court specifically noted, and the minority shareholders conceded, that *"under* Neb.Rev.Stat. § 21-2079 (Reissue 1991), shareholders of a banking corporation, unlike ordinary business corporations, do not have the right to dissent from a merger and receive the fair market value for their shares." (Emphasis supplied.) 245 Neb. at 860, 515 N.W.2d at 668. Nonetheless, this court held that the minority shareholders had *waived* their right to dissent to the merger and were *estopped* from bringing their claims, because they failed to object to the merger application before the Department. *Schmid v. Clarke, Inc., supra.*

This court's reliance on theories of waiver and estoppel implies that the minority shareholders had equitable rights because waiver and estoppel are equitable defenses. See *Welch v. Welch*, 246 Neb. 435, 519 N.W.2d 262 (1994). If the minority shareholders in *Schmid* were without equitable rights, the court would not have had an occasion to discuss waiver and estoppel, for one cannot waive nor be estopped from asserting a right which does not exist. Therefore, *Schmid* stands for the proposition that minority shareholders retain rights in equity separate and distinct from the right to dissent and receive fair value for their shares pursuant to § 21-20,138. See, also, *Doyle v. Union Ins. Co.*, 202 Neb. 599, 277 N.W.2d 36 (1979).

We conclude that bank shareholders possess an equitable right to receive fair value for their shares in the event that they are canceled by a cash-out merger, regardless of their exclusion from such rights under § 21-20,138(3). However, equity no longer requires the unanimous consent of a corporation's shareholders to approve a merger, so long as equity ensures that the shareholders receive fair value for their shares. To the extent that *McLeod v. Lincoln Medical College*, 69 Neb. 555, 98 N.W. 672 (1904), indicates otherwise, it is disapproved.

### 3. AUTHORITY OF DEPARTMENT

The appellants' last assignment of error concerns the authority of the Department to approve or deny a merger application when the merger is unfair to the minority shareholders. According to the appellants, "Given the Department's expertise in the area of evaluating financial institutions, the district court should not be permitted to second guess the Department's Order with respect to the value of the Plaintiffs' shares." Brief for appellants at 19. Apparently, the appellants are contending that the Department's decision to approve or deny a merger is not subject to judicial review on the basis of the merger's fairness to the minority shareholders. The appellee minority shareholders, however, argue that the Department's determination in that regard is not only subject to judicial review, but must be reversed by the district court if the merger is unfair to the minority shareholders. Essentially, the appellee minority shareholders' contention is that the Department is the minority shareholders' sole forum in which to seek relief. We disagree with both parties' positions. What then is the extent of the Department's authority to review the merger's fairness?

Insofar as the appellants' argument is concerned, we have already concluded that the district court properly had jurisdiction pursuant to the APA. Under the APA, the district court has the authority to review an administrative agency's decision without a jury, de novo on the record of the agency. *Wolgamott v. Abramson*, 253 Neb. 350, 570 N.W.2d 818 (1997). Thus, the Department's authority to approve or deny a merger is subject to judicial review, regardless of the grounds upon which the merger is approved or denied.

The appellee minority shareholders' argument is based on our conclusion in *Schmid v. Clarke, Inc.*, 245 Neb. 856, 515 N.W.2d 665 (1994), where we held that the minority shareholders must make an objection to the Department to preserve their rights. The appellee minority shareholders' contention that the Department is the sole forum is not, however, supported by a careful analysis of *Schmid*. First, if the Department were the sole avenue of relief, the district court would not have had subject matter jurisdiction, because the action would have been brought in the wrong forum. Without subject matter jurisdiction, the court would have been powerless to conduct an appellate review of the lower court's decision. See *Kuhlmann v. City of Omaha*, 251 Neb. 176, 556 N.W.2d 15 (1996). Rather, the court would simply have held that it did not have jurisdiction to decide the matter. Second, as we have already stated, the *Schmid* court considered the appellants' claims in equity. Had the Department been the sole forum of relief for the appellee minority shareholders, the appellee minority shareholders would have had an adequate remedy at law, which would have precluded resort to equitable remedies and defenses. See *Pilot Investment Group v. Hofarth*, 250 Neb. 475, 550 N.W.2d 27 (1996).

Although we have not directly addressed the scope of the Department's authority to review a merger application, we have previously addressed the scope of an agency director's authority to deny or approve a bulk reinsurance contract, which is closely analogous to a cash-out merger. See *Doyle v. Union Ins. Co.*, 202 Neb. 599, 277 N.W.2d 36 (1979). In *Doyle*, a mutual insurance company ceded its business to another company by a contract of bulk reinsurance, pursuant to Neb. Rev. Stat. "[s]ection 44-224.05, R. R. S. 1943." *Doyle v. Union Ins. Co.*, 202 Neb. at 604, 277 N.W.2d at 39. The transaction required the approval of a majority of the policyholders and the Director of Insurance, who was to ensure that the contract was " 'fair and equitable to the policyholders of each insurer . . . .' " (Emphasis omitted.) *Id.* The contract was indeed approved by the director and a majority of the policyholders, which resulted in the policyholders' receiving a distribution of their equity in the surplus funds of the company, as required by the statute. The policy-

holders then brought a class action in the district court, alleging that the directors of the company had breached their fiduciary duties by, inter alia, selling the company for less than its fair value, which action the court considered in equity.

As a threshold matter, the court addressed the effect of the approval of the contract by the Director of Insurance. The court stated:

> Nowhere does this statute or the related statutes impliedly or expressly demonstrate an intent to abridge or limit the common law rights of policyholders, who are, in the case of a mutual company, its owners. Rather, the statutes indicate that review and approval by the Director of Insurance is *intended to be an initial screening process by means of which obviously inequitable arrangements may be avoided without the necessity of possible expensive and protracted litigation by policyholders.* Neither does the language of the statute demonstrate any intention that mere approval by the Director of Insurance absolves (assuming that this is a legislative prerogative) the corporate directors from liability for violation of their fiduciary duties.

(Emphasis supplied.) *Id.* at 605, 277 N.W.2d at 40.

Likewise, the statute at issue in the instant case, § 8-157(3), merely states that bank mergers are authorized "[w]ith the approval of the director." The statute does not indicate that the director's approval absolves the bank of any obligations it may owe to the minority shareholders. The Department, as an administrative agency, has only that power which has been granted to it by the Legislature. *Wagoner v. Central Platte Nat. Resources Dist.*, 247 Neb. 233, 526 N.W.2d 422 (1995); *Ventura v. State*, 246 Neb. 116, 517 N.W.2d 368 (1994). Furthermore, as a general rule, administrative agencies have no general judicial powers, notwithstanding that they may perform some quasi-judicial duties. *Ventura v. State, supra.* Only a judicial tribunal, and not an administrative agency acting as a quasi-judicial tribunal, can provide relief that is "within the general power of the court" to provide. *Ventura v. State, supra.*

Section 8-157(3)'s plain language authorizes the Department to either approve or deny a bank merger; nowhere does the

statute indicate that the Department is required to disapprove a merger that is unfair to the minority shareholders, nor does it indicate that the Department is empowered to require a bank to pay the fair value of a dissenter's shares, which is a historically equitable remedy. As we stated in *Doyle* when discussing the effect of the Director of Insurance's approval of an insurance application:

> "It is true he may disapprove a control transaction when he finds it unfair or unreasonable to policyholders. Thus, as an incident of his powers he may provide a preventive administrative remedy for the wrongs alleged in this case. However, the statutory power to disapprove a control transaction is a limited power. It is not a legislative delegation to the insurance commissioner of jurisdiction over corporate insider torts, even though the commissioner is granted administrative authority to disapprove control transactions when such wrongs appear."

*Doyle v. Union Ins. Co.*, 202 Neb. 599, 607, 277 N.W.2d 36, 41 (1979), quoting *Rowen v. LeMars Mut. Ins. Co. of Iowa*, 230 N.W.2d 905 (Iowa 1975).

Finally, we note that Neb. Rev. Stat. § 8-102 (Reissue 1997), the Legislature's "declaration of public purpose," states that "banks . . . are hereby declared to be quasi-public in nature and subject to regulation and control by the state." We have long held that the banking laws were intended to protect the health of the banking industry for the benefit of the entire public. See, e.g., *In re Invol. Dissolution of Battle Creek State Bank, ante* p. 120, 575 N.W.2d 356 (1998). Thus, the Department has a duty to consider the potential effects of a particular merger on the entire banking industry, which may override whatever concerns the Department may have about the fairness of the merger to the minority shareholders.

For example, in the instant case, the Department approved the merger even though one minority shareholder, Stuckey, received more for his shares of LSB&T than the remaining minority shareholders. Therefore, the Department did not ensure that LSB&T's minority shareholders were treated with fundamental fairness, since as a matter of law, fundamental fairness requires that all minority shareholders receive the same

treatment. This is not to say that the Department erred in approving the merger as a matter of law. It only points out that the inherent conflict of interest between the needs of the banking industry and the needs of minority shareholders is properly resolved by the district courts in a separate equity proceeding, and not by the Department's approval proceeding.

In sum, "the Department of Banking and Finance has the authority to *consider* the fairness of a merger to minority shareholders." (Emphasis supplied.) *Schmid v. Clarke, Inc.*, 245 Neb. 856, 860-61, 515 N.W.2d 665, 669 (1994). Nevertheless, that authority does not *require* the Department to deny a merger application merely because the minority shareholders will receive less than fair value for their shares, see *IRA ex rel. Oppenheimer v. Brenner Companies Inc.*, 107 N.C. App. 16, 419 S.E.2d 354 (1992), nor does it empower the Department to compel payment of fair value to the shareholders. The shareholders in *Schmid* were not estopped because the Department was the sole forum for their claim; rather, they were estopped because, had they made a timely objection to the Department, they may have prevented the merger entirely, obviating the need for a remedy.

## V. CONCLUSION

We conclude that the district court properly exercised its jurisdiction pursuant to the APA and correctly determined that the Department was required to hold a hearing concerning the appellants' merger application. On remand to the Department, the Department must consider the fairness of the merger to the minority shareholders, which consideration acts as an initial screening process. If the Department determines that the merger warrants approval even though the minority shareholders will not receive fair value for their shares, then the minority shareholders may bring an action in equity in the district court to receive fair value for their shares. We affirm.

AFFIRMED.

CAPORALE, WRIGHT, and STEPHAN, JJ., not participating.