ALAN W. LANGVARDT, M.D., APPELLEE, v.
MARK B. HORTON ET AL., APPELLANTS.
581 N.W.2d 60

Filed July 2, 1998.    No. S-95-867.

Don Stenberg, Attorney General, and James D. Smith for appellants.

Arthur R. Langvardt, of Langvardt & Valle, for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, and McCORMACK, JJ.

GERRARD, J.

This appeal arises from a physician disciplinary proceeding at the Nebraska Department of Health. The department found that the actions of Alan W. Langvardt, M.D., in diagnosing and treating a young patient rose to the level of gross incompetence in violation of Neb. Rev. Stat. § 71-147(5)(d) (Reissue 1990). The district court, in its de novo review of the record, found that the evidence failed to establish that Langvardt was guilty of either gross negligence or gross incompetence, and reversed the decision of the department. The department appealed. Finding no error appearing on the record, we affirm the order of the district court.

## I. FACTUAL BACKGROUND

### 1. CHRONOLOGY OF EVENTS

On August 23, 1990, a 3-year-old male patient was admitted to the Beatrice Community Hospital for elective outpatient hernia surgery to be performed by Langvardt, a physician licensed in Nebraska and certified by the American Board of Family Practice. Once the patient had been anesthetized with a general anesthetic, the attending nurse anesthetist selected and started an intravenous line (IV). The nurse anesthetist used a 500-cc bag of 5 percent dextrose and water (D5/W), which is sugar water with no sodium. No regulating pump was used.

The hernia surgery took approximately 45 minutes to 1 hour and went routinely. Approximately 200 cc of the IV solution was used during surgery, which is an average amount of solution to use during a procedure of that length.

When the patient was taken to the recovery room at approximately 9:30 a.m., the IV that had been started in the operating room was continued. Langvardt observed the patient in the recovery room and left postsurgical orders. In particular, Langvardt ordered that the patient be left on the IV at 40 cc per hour until he was awake and eating and that Langvardt could be called for a possible dismissal order later in the afternoon if the patient was doing well and there were no problems.

Langvardt observed that the patient appeared to be awakening normally in the recovery room. The patient was in the recovery room for approximately 30 minutes, during which approximately 50 cc of IV fluid was infused. When the 3-year-old patient was sent from the recovery room to his room on the outpatient floor at approximately 10:10 a.m., he began to awake, cry, and come out of the anesthesia. At about this same time, Langvardt left the hospital to go to his office, where he saw patients for the rest of the day.

A nurse working the 6 a.m. to 6 p.m. shift took over the patient's care when he was brought to the outpatient floor. The nurse hung a second 500-cc IV bag at approximately 11:45 a.m. This means that the approximately 250 cc of IV solution that had been remaining in the bag at 10:10 a.m. had all been infused in 1 hour 30 minutes. At 6 p.m., the second bag of solu-

tion ran out, and the nurse hung a third 500-cc bag. Each of these additional bags contained the same solution that had been started during surgery.

The nurse had her first contact with Langvardt between 5:30 and 6 p.m., when she reached him at his clinic. The nurse told Langvardt that the patient had experienced a seizure and that he was drowsy, gave him the patient's vital signs, and told him that the patient's parents wanted to know if he could have his seizure medication. Two years prior to the surgery, the patient had experienced febrile seizures, i.e., seizures with fever. Langvardt thought that this history might suggest that the patient was susceptible to seizures and agreed that he could be given his medication. However, the patient's parents were unable to find the medication.

The nurse contacted Langvardt at the clinic again at approximately 6:45 p.m. The nurse told Langvardt that the patient had experienced a second seizure. She told Langvardt that she did not feel that the seizures were due to a febrile condition because his temperature was normal. The patient's clinic records indicated that he had previously been prescribed one-half milligram of Ativan for seizures, and a telephone order was written for that amount. The nurse asked Langvardt how he wanted the Ativan administered, orally or through the IV. Langvardt asked whether the IV was still going, and the nurse told him that it was, that the patient still had not eaten, and that the IV was running at a "keep open" rate.

A second nurse who was working the 3 to 11 p.m. shift took over the care of the patient at approximately 6:30 or 7 p.m. At that time, the patient was not awake and not responding verbally, but did move around in bed. Shortly after the second nurse began working with the patient, she and the patient's mother attempted to give him Ativan orally, pursuant to Langvardt's telephone order. The patient did not take the oral dose well, and it ran down his mouth.

Langvardt returned to the hospital around 7:30 or 8 p.m. because one of his other patients was beginning labor; at this time, he checked on the young patient. At 8:10 p.m., while Langvardt was present, the patient had another seizure. Langvardt ordered that one-half milligram of Ativan be given

through the IV. At 8:25 p.m., the nursing supervisor gave the patient the Ativan; she gave a second dose per Langvardt's orders at approximately 9:05 p.m. The patient seized again at approximately 9:25 p.m. Following the last dose of Ativan and the seizure at 9:25 p.m., there was no further seizure activity or vomiting; the patient remained unresponsive to verbal stimuli.

Langvardt returned to check on the patient at approximately 10:10 p.m. Langvardt reported that the patient seemed to be resting peacefully and had not had any more seizures. He was not very responsive, but Langvardt thought this was explained by the aftereffects of the seizures and of the seizure medication.

Another nurse who worked the 11 p.m. to 7 a.m. shift that night took over the care of the patient around 11 p.m. At 11:45 p.m., she notified Langvardt of the patient's status; Langvardt ordered the IV solution changed to a 5-percent dextrose solution with one-half normal saline at 30 cc per hour on a pump and ordered that they check his vital signs every 2 hours through the night.

Shortly after midnight, the patient experienced respiratory arrest, and the nurse told Langvardt that he should return to the hospital. Artificial respiration was initiated by the house supervisor and then taken over by an anesthetist who intubated the patient and continued breathing for him with a bag. Tests indicated that the patient's sodium count was too low, and it was determined from his chart that more IV solution than ordered had been infused. At 1:35 a.m., Langvardt ordered the IV changed to a normal saline solution.

At 2:43 a.m. on August 24, 1990, the patient was transferred to Saint Elizabeth Community Health Center in Lincoln, where he died on August 25. The cause of death was diffuse cerebral edema that resulted from an infusion of free water that contained no sodium, also referred to as "water intoxication."

### 2. EXPERT TESTIMONY

#### (a) Dr. Robert Harry

The State offered the deposition of Dr. Robert Harry, a member of the Board of Examiners in Medicine and Surgery for the State of Nebraska. Harry testified that it was common for the anesthetist to start the IV solution and that if the proper solution

was started, it was not contrary to general practice to continue the same IV solution following surgery. However, Harry stated that it was unusual for D5/W to be used. He testified that a solution with saline would avoid the problem that occurred in this case, even if infused at similar levels, but that D5/W could have been given at 40 cc without problems. Harry testified that the standard of care did not require the use of an IV pump and that when a short stay was expected, it was not unusual not to use a pump.

Harry further testified that it was not unusual to prescribe Ativan for seizures. However, he stated that when a child comes into the hospital healthy, has seizures, and has a history of seizures with fever but does not have a fever, the physician should go through a list of possible diagnoses. It was Harry's opinion that Langvardt should have ruled out febrile seizure at the outset. Harry stated that not ordering tests earlier in the evening, e.g., at 7:30 p.m., did not violate the standard of care, but that it would have been appropriate to have done the tests at that time. Harry testified that Langvardt was ultimately responsible for monitoring the patient's progress and that Langvardt would have been aware of some complications, the seizures, as early as 5:30 p.m.

In his written report, Harry had stated that Langvardt was grossly negligent. However, at the time of his deposition, he had retracted that judgment and felt that Langvardt had not been grossly negligent but had only displayed poor judgment. Harry testified further that once Langvardt recognized that too much IV solution had been infused, he responded appropriately, and that his corrective action met the standard of care.

### (b) Dr. Louis Gogela, Jr.

Dr. Louis Gogela, Jr., a physician and general surgeon, testified on behalf of Langvardt. Gogela testified that the use of D5/W had been routine at the hospital under the circumstances and that the lack of an IV pump did not violate the standard of care. He testified that it was a universal rule and a basic expectation of all surgeons that they be notified if the IV fluid is infused at a greater rate than was ordered.

Gogela testified that if the first knowledge Langvardt had of any problems was the call at around 6 p.m. when it was reported

to him that the patient had experienced seizures and that if Langvardt knew of the patient's history of seizures, prescribing Ativan would have been an appropriate response, even though the patient did not have a fever. Had no history of seizures been present, it was Gogela's opinion that further evaluation should have been done. Gogela testified that late in the evening, Langvardt would have expected the patient to be somnolent, lethargic, sleeping, and recovering from the seizures and the medication. While Gogela stated that he would have evaluated the child further, it was his opinion that Langvardt's response to the seizures was in accord with the prevailing standard of care.

Gogela further testified that Langvardt's general level of medical knowledge and skill is better than the great majority of family practitioners and primary care physicians in the area.

### (c) Dr. Eric S. Thomsen

Dr. Eric S. Thomsen, a family practice physician, also testified on behalf of Langvardt. It was Thomsen's opinion that the use of the D5/W solution during surgery and postoperatively for a pediatric patient was in accord with the practices generally followed in that area at the time. Thomsen testified that given the way this order was written, he would not have expected the nurse to assume she should continue to hang bags of IV fluid without checking with the physician.

It was Thomsen's opinion that given no report from the nursing staff of the IV rate and Langvardt's knowledge of the patient's history of seizures, it was reasonable to prescribe Ativan to control the seizures when the seizures were reported to him. The patient's history of seizures would have suggested that he had a lower threshold for seizures, with or without fever. Thomsen testified that it would have been good if the tests that were eventually run after midnight had been run earlier and that running the tests would not have been a response that was contrary to the information Langvardt was getting about the patient's condition.

Thomsen testified further that when Langvardt saw the patient around 10 p.m., the drowsiness, lethargy, and lack of responsiveness would have been consistent with the patient's postictal state and having been given Ativan. He stated that

without the information regarding the IV fluid, it was reasonable for Langvardt to think that he had dealt with the problem.

Thomsen testified that he might have started to check into things earlier, at 8 p.m. or even 6 p.m., and that it would not have been unreasonable for Langvardt to have looked at the chart. Thomsen also stated that it was the physician's responsibility to evaluate the patient, to check into problems when they occur, and to consider various alternatives.

### (d) Dr. Dean L. Antonson

Dr. Dean L. Antonson, a pediatric gastroenterologist, also testified for Langvardt. Antonson testified that the standard practice would be to use an IV solution containing sodium but that it was not inappropriate to use a water solution like D5/W if it was anticipated that it would only be needed for a short time. He testified that the 40-cc rate that was ordered was appropriate and that the D5/W solution could have run at that rate for an extended period of time (even 24 hours), but that he would not have recommended D5/W, even for a period of 8 hours. Antonson testified further that there had been no substantial deviation from the accepted standard of care to not use an infusion pump; however, the smaller the child, the better off one is to use something to regulate the IV flow.

Antonson testified that the rate at which the fluid was infused was a significant error and should have been reported so that the IV could have been changed or discontinued. It was Antonson's opinion that there was no reason Langvardt should have expected that the patient was receiving two to three times the IV fluid that was ordered and that there was no indication during the day that there had been any problem with regulating the IV flow.

Antonson testified that the approach Langvardt took to treat the seizure activity around 6 p.m. was well within the standard of care and that when Langvardt saw the patient around 10 p.m., he would have expected to find him sleeping or drowsy from the seizures and the medication. Once the patient stopped breathing, Langvardt ordered the proper tests and immediately recognized the problem. Antonson believed that Langvardt's response would have been the same earlier, had he been informed of the error.

### 3. Order from Department

A petition for disciplinary action was filed against Langvardt on February 11, 1993, alleging that Langvardt had been grossly negligent or grossly incompetent in his treatment of the 3-year-old patient in violation of § 71-147(5)(d). On August 31 and September 2 and 3, a hearing was held before a hearing officer for the department.

The order of Mark B. Horton, M.D., Director of Health (Director), dated October 11, 1994, summarized the events that occurred on August 23 and 24, 1990; the testimony of each witness; and the evidence from the medical records. Then, the Director set forth his own qualifications, including the fact that he is a physician and diplomate of the American Board of Pediatrics, his assessment of the expert testimony presented, and his own expert opinions. The Director found that each of the experts had reservations concerning Langvardt's postoperative conduct. It was the Director's opinion that the nurses' failure to properly monitor the IV and to report irregularities to Langvardt impeded his ability to timely discover the fact that the patient was receiving an excessive amount of IV solution. However, it was also the Director's opinion that Langvardt was negligent (1) in his management of the IV infusion because he failed to specify the IV solution to be used after surgery and he failed to order the preferable and correct solution; (2) because when it was clear that the patient would be in the hospital for an extended period, Langvardt failed to adequately assess the amount and type of IV fluids the child had received, he failed to order blood tests to evaluate his blood electrolyte status, and he failed to order the proper maintenance fluids; (3) because when told the IV was running at a "keep open" rate which did not match his original order, Langvardt failed to clarify his order; (4) when he failed to order a monitor; (5) because at 11:45 p.m., when Langvardt realized that the patient was still on D5/W, he changed the solution, but did not order blood tests to determine the child's electrolyte status, and he did not review the total volume and rate of the infusion; and (6) when Langvardt failed to recognize the significance of lethargy and vomiting in the afternoon and of the seizure activity late in the day. It was the Director's opinion that Langvardt demonstrated gross incompe-

tence, arising from lack of knowledge and leading to inaction on his part.

The Director concluded that Langvardt's actions and omissions rose to the level of gross incompetence in violation of § 71-147(5)(d), but that his conduct, while negligent, did not rise to the level of gross negligence.

After a dispositional hearing on November 10, 1994, the Director ordered that Langvardt's license to practice medicine be limited to the extent that Langvardt not be allowed to perform surgery on children under the age of 12 or allowed to care for hospitalized children, except normal newborns, unless a coattending physician is assigned to the case and supervises Langvardt's care. This limitation was to stay in place until Langvardt completed certain remedial coursework.

### 4. APPEAL TO DISTRICT COURT

Langvardt appealed the determination of the department to the district court. In conducting a de novo review, the district court considered the medical opinions of the Director, along with the evidence presented at the hearing in the department. The district court found that the evidence failed to establish that Langvardt was guilty of either gross negligence or gross incompetence. Accordingly, the district court reversed the order of the department and dismissed the proceedings. The department appealed, and we removed the case to our docket pursuant to our power to regulate the caseloads of this court and the Nebraska Court of Appeals.

### II. STANDARD OF REVIEW

Under Neb. Rev. Stat. § 84-917(5)(a) (Reissue 1994), when a petition instituting proceedings for review under the Administrative Procedure Act (APA) is filed in the district court on or after July 1, 1989, the review shall be conducted by the court without a jury de novo on the record of the agency. *Miller v. Horton*, 253 Neb. 1009, 574 N.W.2d 112 (1998).

A final order rendered by a district court in a judicial review pursuant to the APA may be reversed, vacated, or modified by an appellate court for errors appearing on the record. *Id.* On an appeal under the APA, an appellate court reviews the judgment of the district court for errors appearing on the record and will

not substitute its factual findings for those of the district court where competent evidence supports those findings. *Id.* Finally, when reviewing an order of a district court under the APA for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

## III. ASSIGNMENTS OF ERROR

The department asserts that the district court erred in (1) determining that the evidence failed to establish that Langvardt was guilty of gross incompetence and (2) failing to affirm the Director's decision once it found that the Director's medical opinions should be considered because the decision was supported by substantial evidence justifying the order made, the Director acted within the scope of his authority, and the order was not arbitrary, capricious, or unreasonable.

## IV. ANALYSIS

### 1. STANDARD OF REVIEW

The department claims that the district court applied the incorrect standard of review in conducting a de novo review on the agency record. The department argues that under our holding in *Scott v. State ex rel. Board of Nursing*, 196 Neb. 681, 244 N.W.2d 683 (1976), the proper standard of review was whether the Director's decision was supported by substantial evidence and was not arbitrary, capricious, or unreasonable. In contrast, Langvardt contends that under § 84-917(5)(a) of the APA, the district court appropriately conducted a de novo review. Langvardt argues that *Scott v. State ex rel. Board of Nursing, supra*, was decided prior to the enactment of the present version of § 84-917(5)(a) and, thus, is no longer applicable. Therefore, the issue we must decide is whether the district court is to review a physician disciplinary determination by the department de novo on the record of the proceedings or review the matter to determine whether there is substantial evidence to support the Director's decision and whether the decision is arbitrary, capricious, or unreasonable.

Neb. Rev. Stat. § 71-159 (Reissue 1996) provides that disciplinary measures taken against a professional licensee may be

appealed, and such appeal "shall be in accordance with the Administrative Procedure Act." Section 84-917(1) provides that any person aggrieved by a final decision in a contested case is entitled to judicial review under the APA. Under § 84-917(5)(a), when a petition instituting proceedings for review under the APA is filed in the district court on or after July 1, 1989, the review shall be conducted by the district court without a jury de novo on the record of the agency. *Miller v. Horton, supra.* The record consists of the transcripts and bill of exceptions of the proceedings before the agency and facts capable of being judicially noticed pursuant to Neb. Evid. R. 201. *Slack Nsg. Home v. Department of Soc. Servs.*, 247 Neb. 452, 528 N.W.2d 285 (1995). In a true de novo review, the district court's decision is to be made independently of the agency's prior disposition, and the district court is not required to give deference to the findings of fact and the decision of the agency hearing officer. *Id.*

An aggrieved party may obtain review of any judgment or final order entered by a district court under the APA, and Neb. Rev. Stat. § 84-918 (Reissue 1994) provides the standard of review for the appellate court. Appeals involving petitions filed on or after July 1, 1989, are reviewed by an appellate court for errors appearing on the record. § 84-918(3). An appellate court, in reviewing a judgment of the district court for errors appearing on the record, will not substitute its factual findings for those of the district court where competent evidence supports those findings. *Bell Fed. Credit Union v. Christianson*, 244 Neb. 267, 505 N.W.2d 710 (1993).

Nonetheless, the department asserts that in *Scott v. State ex rel. Board of Nursing*, 196 Neb. 681, 687-88, 244 N.W.2d 683, 688 (1976), we stated that "[t]he licensing and regulation of the health profession and other matters dealing with health is a legislative function which [the legislative] branch of government ordinarily carries out through administrative agencies created by it." Relying on the conclusion that "[t]he licensing and regulation of the health profession" is a legislative function, we reasoned that a statute which purports to give a court the power to review an exercise of legislative power de novo, in the sense that the court may substitute its own judgment for that of the administrative agency to which the Legislature has delegated

the power, is unconstitutional as a violation of the separation of powers doctrine. *Id.* Thus, we determined that in health disciplinary proceedings that "the Legislature did not intend to use the term de novo in the sense that the reviewing court could substitute its own judgment for the expert judgment of the board." *Id.* at 689, 244 N.W.2d at 689. However, we have departed significantly from the reasoning in *Scott v. State ex rel. Board of Nursing* since the enactment of the 1989 amendments to §§ 84-917 and 84-918.

In *Slack Nsg. Home v. Department of Soc. Servs., supra,* we undertook an extensive analysis of the standard of review set forth in §§ 84-917 and 84-918 in light of the separation of powers doctrine. We noted that § 84-917(1) provides that any person aggrieved by a final decision in a *contested case* is entitled to judicial review under the APA. A contested case is defined in Neb. Rev. Stat. § 84-901(3) (Reissue 1994) as "a proceeding before an agency in which the legal rights, duties, or privileges of specific parties are required by law or constitutional right to be determined after an agency hearing." In determining whether the scope of review in §§ 84-917 and 84-918 violated the separation of powers doctrine, we focused on the actual functions performed at the hearing under review, rather than focusing on the nebulous distinction of whether an administrative agency is exercising a "legislative" function or a "judicial" function based solely on the nature of the proceeding. For purposes of the separation of powers doctrine, we concluded that an administrative agency carries out a quasi-judicial function any time it conducts a hearing to determine the rights, duties, or privileges of specific parties as required by law or constitutional right. See *Slack Nsg. Home v. Department of Soc. Servs.,* 247 Neb. 452, 528 N.W.2d 285 (1995).

In other words, when a statute or constitutional right requires notice and hearing, the administrative body takes on a quasi-judicial character when it makes a binding determination resolving a disputed claim between specific parties after such a hearing. See *Stoneman v. United Neb. Bank, ante* p. 477, 577 N.W.2d 271 (1998). It has never been a part of the legislative function to resolve contested claims of rights between specific parties based on evidentiary facts.

In the instant case, Neb. Rev. Stat. § 71-150(3) (Reissue 1996) requires the Attorney General to file a petition in order for the Director of Regulation and Licensure to discipline a licensee. Neb. Rev. Stat. § 71-153 (Reissue 1996) specifically requires that an order be issued "fixing the time and place for the hearing." Neb. Rev. Stat. § 71-155 (Supp. 1997) states that "[t]he proceeding under section 71-150 shall be summary in its nature and *triable as an equity action* and shall be *heard* by the Director of Regulation and Licensure or by a hearing officer designated by the director under rules and regulations of the department." (Emphasis supplied.) That section empowers the director or the hearing officer to receive affidavits into "evidence," administer "oaths," "subpoena witnesses and compel their attendance," "issue subpoenas duces tecum," and consider depositions. Furthermore, § 71-155 states that "[i]f the director determines that *guilt* has been established, the director may . . . consult with the board of examiners for the profession involved concerning sanctions to be imposed or terms and conditions of the sanctions." (Emphasis supplied.) Perhaps most importantly, Neb. Rev. Stat. § 71-155.01 (Supp. 1997) refers to such proceedings as "contested cases."

The above review of the statutes governing this type of disciplinary proceeding clearly indicates that notice and a hearing are required prior to disposition and that the hearing involves the adjudication of evidentiary facts. Everything about the procedure involved is in the nature of a judicial proceeding, requiring specific findings of fact concerning a particular individual and leading to a decision binding on the parties.

Therefore, because the proceeding against Langvardt was clearly a contested case under § 84-901(3) that was quasi-judicial in nature, we conclude that the district court properly conducted a de novo review of the agency record. Under the APA, the district courts have only one standard of review for contested cases filed on or after July 1, 1989. For contested cases, the review shall be conducted by the court without a jury de novo on the record of the agency. *Miller v. Horton*, 253 Neb. 1009, 574 N.W.2d 112 (1998); *Slack Nsg. Home v. Department of Soc. Servs., supra.* To the extent that *Scott v. State ex rel. Board of Nursing*, 196 Neb. 681, 244 N.W.2d 683 (1976), implies that a

true de novo review by a district court of a health department determination in a contested disciplinary proceeding violates the separation of powers doctrine, it is hereby overruled.

We now proceed to review the judgment of the district court for errors appearing on the record, keeping in mind that our inquiry is whether the district court decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Miller v. Horton, supra.*

## 2. DIRECTOR'S EXPERT OPINION

Before we review that portion of the record which contains the Director's own expert opinions, we must decide whether the Director properly provided his own expert opinions and whether the district court correctly took into consideration the Director's own expert opinions in its de novo review. Langvardt contends that Neb. Rev. Stat. § 84-914(5) (Reissue 1994) requires that he be notified of the Director's intent to utilize his own opinions. Langvardt asserts that because he had not been given notice of the Director's intent to use his own expertise and because the Director's opinions were not offered into evidence, he had no opportunity to cross-examine or otherwise challenge those opinions.

Section 84-914(5) provides as follows:

> An agency may take official notice of cognizable facts and in addition may take official notice of general, technical, or scientific facts within its specialized knowledge and the rules and regulations adopted and promulgated by such agency. Parties shall be notified either before or during the hearing or by reference in preliminary reports or otherwise of material so noticed. Parties shall be afforded an opportunity to contest facts so noticed. The record shall contain a written record of everything officially noticed. An agency may utilize its experience, technical competence, and specialized knowledge in the evaluation of the evidence presented to it[.]

The policy behind this rule is clear. Fair warning of an agency's intention to take notice of a fact or matter not in evidence must be given to the parties so as to allow them to address the matter in question at the hearing. This prevents any prejudice or sur-

prise to the parties. The parties are to be given a chance to rebut or to comment on any evidence considered by the agency when making its decision. See *In re Application of ATS Mobile Telephone*, 213 Neb. 403, 330 N.W.2d 123 (1983).

However, § 84-914(5) distinguishes situations in which the agency takes notice of facts within its specialized knowledge from those in which an agency utilizes its expertise in evaluating the evidence presented to it. In the former situation, notification to the parties is required; whereas, in the latter situation, it is not. Therefore, we must determine whether the opinions offered by the Director constituted cognizable facts that were outside the record or whether these opinions represented the Director's utilization of his expertise in evaluating the evidence in the record.

In the instant case, each of the matters on which the Director expressed his opinions was an issue which had been contested at the hearing. With regard to the type of IV solution used, the Director determined that Langvardt had failed to specify the IV solution to be used, failed to order the preferable and correct solution, and failed to order the proper maintenance fluids once it was clear that the patient would be in the hospital for an extended period. Each of the experts testified to the nature of the IV solution given to the patient, its characteristics, and its drawbacks. Langvardt had a full opportunity to examine and did examine each expert as to the propriety of utilizing D5/W.

The Director also expressed his opinion about Langvardt's failure to monitor the rate at which the IV solution was infused. He determined that Langvardt had failed to adequately assess the amount and type of IV fluids the patient had received, failed to clarify his order when told the IV was running at a "keep open" rate that did not match his orders, failed to order an IV monitor, and failed to review the total volume and rate of the infusion at 11:45 p.m., when Langvardt ordered that the IV solution be changed. Again, the rate at which the IV solution was infused, what Langvardt knew about that rate, and his responses were issues testified to by each expert at the hearing, and Langvardt examined each expert in this regard.

The Director also found that Langvardt had failed to order blood tests to evaluate the patient's electrolyte status both at the

time it was clear that the patient would be in the hospital for an extended period and at 11:45 p.m., when he changed the IV solution. Similarly, the Director found that Langvardt failed to recognize the significance of lethargy and vomiting in the afternoon and of the seizure activity late in the day as signs of water intoxication. The importance of the blood tests and whether Langvardt should have performed the tests earlier, the significance of the patient's symptoms, and the appropriateness of Langvardt's responses were all contested issues. The experts were examined by Langvardt about each of these matters.

Thus, we conclude that the Director was not substituting his expert knowledge for evidence in the record of the hearing, but, rather, used his experience and knowledge in evaluating the facts in the record. The Director did not introduce new facts or evidence but evaluated the evidence presented in light of his specialized knowledge and medical background. That the Director's ultimate judgment may have differed from those of the experts testifying at the hearing in no way diminishes the fact that it was an expert evaluation. Accordingly, we determine that the district court properly took into consideration the expert opinions of the Director in its de novo review.

### 3. Gross Incompetence

The Director determined that Langvardt's actions on August 23 and 24, 1990, demonstrated gross incompetence; however, the Director further determined that while Langvardt's actions were negligent, his conduct did not rise to the level of gross negligence. Section 71-147 provides, in pertinent part, that "[a] license . . . to practice a profession may be . . . limited, revoked, or suspended . . . when the . . . licensee . . . is guilty of . . . (5) practic[ing] . . . the profession . . . (d) with gross incompetence or gross negligence . . . ." Although the statute does not define gross incompetence as that term is used in § 71-147(5)(d), and we have not defined the term in the context of a professional disciplinary proceeding, other jurisdictions have had the opportunity to define "gross incompetence" in medical disciplinary proceedings.

"Incompetence" refers to a demonstrated lack of ability to perform a required duty. See *Lee v. State Bd. of Dental*

*Examiners*, 654 P.2d 839 (Colo. 1982). "Gross" means " '[o]ut of all measure; beyond allowance; not to be excused; flagrant, shameful; as, a *gross* dereli[c]tion of duty; a *gross* injustice; *gross* carelessness.' " *Id.* at 845 (quoting *State Board v. Savelle*, 90 Colo. 177, 8 P.2d 693 (1932), *appeal dismissed* 287 U.S. 562, 53 S. Ct. 5, 77 L. Ed. 496). Thus, the term "gross incompetence," at least in the context of the practice of medicine, § 71-147(5)(d), connotes such an extreme deficiency on the part of a physician in the basic knowledge and skill necessary for diagnosis and treatment that one may reasonably question his or her ability to practice medicine at the threshold level of professional competence. See, generally, *Yoshizawa v. Hewitt*, 52 F.2d 411 (9th Cir. 1931); *Franz v. Board of Medical Quality Assur.*, 31 Cal. 3d 124, 642 P.2d 792, 181 Cal. Rptr. 732 (1982); *Lee v. State Bd. of Dental Examiners, supra*; *Nurse Examiners v. Hohu*, 129 Colo. 195, 268 P.2d 401 (1954); *N. J. State Bd. of Optometrists v. Nemitz*, 21 N.J. Super. 18, 90 A.2d 740 (1952); *Stacey v. Board of Accountancy*, 26 Or. App. 541, 553 P.2d 1074 (1976).

The district court was correct to conclude that the record in the instant case is lacking in the quantum of evidence necessary to support a reasonable inference that Langvardt was "grossly incompetent" in his treatment of the 3-year-old patient. Each of the experts testified that while it may have been preferable to have ordered a different IV solution, to have assessed the situation more thoroughly, or to have acted earlier in the evening, none of Langvardt's responses were inexcusable given his knowledge of the patient's history and his lack of information regarding the rate of IV infusion. While the experts agreed that the patient's symptoms could be, and ultimately were, signs of water intoxication, they testified that Langvardt's actions were not contrary to the indications and the information he had received at the time.

There was no indication that Langvardt did not know the proper rate of IV fluid infusion for a child the patient's size. The experts agreed that Langvardt's order of 40 cc per hour was a proper postsurgical order. In addition, there was no evidence that Langvardt did not know how to respond to an infusion of excess fluids. The experts testified that once it became clear that

too much solution had been infused, Langvardt's response and corrective measures were appropriate. Moreover, Antonson testified that had Langvardt been informed of the error with the IV earlier in the day, he would have responded appropriately at that time.

Gogela testified that Langvardt's general level of medical knowledge and skill is better than that of the great majority of family practitioners and primary care physicians in the area. In addition, Thomsen testified that Langvardt is a very competent physician and that he has enough knowledge and skill to practice at a level above that which is generally observed in the area. These assessments of Langvardt's basic skill level were not contradicted by any evidence in the record.

Even when giving some deference to the Director's opinion that Langvardt was *negligent* in (1) his management of the IV infusion, (2) his assessment of the amount and type of IV fluids the patient had received, (3) failing to clarify his original order or order a monitor, and (4) failing to timely order blood tests or recognize the significance of lethargy and vomiting in the afternoon and of the later seizure activity, the record does not sustain a conclusion that Langvardt lacked the *basic knowledge and skill* necessary to diagnose and treat young patients such that one would reasonably question his ability to practice medicine at the threshold level of professional competence. Thus, we find no error in the district court's determination that the evidence failed to establish that Langvardt was guilty of either gross negligence or gross incompetence. The department's assignments of error are without merit.

## V. CONCLUSION

Because the district court decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable, we find no error appearing on the record necessitating a reversal, vacation, or modification of the judgment. For these reasons, we affirm the judgment of the district court.

AFFIRMED.

STEPHAN, J., not participating.